# In the

# United States Court of Appeals

## For the Seventh Circuit

———————

Nos. 03-3547 & 03-3695

EDWARD WEST,

*Plaintiff-Appellant,*

v.

ORTHO-MCNEIL PHARMACEUTICAL
CORPORATION,

*Defendant-Appellee.*

———————

Appeals from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 01 C 3724—**Harry D. Leinenweber**, *Judge.*

———————

ARGUED FEBRUARY 8, 2005—DECIDED APRIL 21, 2005

———————

Before RIPPLE, EVANS, and SYKES,[1] *Circuit Judges.*

EVANS, *Circuit Judge.* In 1997, just a month before his
60th birthday, Edward West, an African-American male,

---

[1] Circuit Judge Ann C. Williams was originally a member of
the panel assigned to this case. After hearing oral arguments,
Judge Williams decided to recuse herself from further participa-
tion in the case. Circuit Judge Diane S. Sykes was randomly se-
lected to join the panel. Judge Sykes has read the briefs, studied
the record, and listened to the tape of the oral arguments.

was hired by a company called Innovex. Innovex provided pharmaceutical companies, like the defendant Ortho-McNeil Pharmaceutical Corporation (OMPC), with contract sales representatives. Two years later, in 1999, OMPC hired West (and 10 other Innovex employees) as a direct sales representative of the company. OMPC terminated West in July of 2000 for, it claimed, violations of company policies. West thought the termination was caused by his race and age.

After West filed suit, the district court granted, in part, OMPC's motion for summary judgment, leaving only two issues for trial: whether OMPC was motivated by race in terminating West, and whether his supervisor, Walter Pascale, approved of West's distribution of certain "homemade" promotional sales materials. Prior to starting the trial, the court ruled in limine that seven of eight racially offensive statements Pascale was alleged to have made were excluded as being too remote in time from the termination.

Trial commenced with West representing himself. At the close of his case-in-chief, the district court granted OMPC's motion, pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law. West appeals from that decision, from the exclusion of seven of Pascale's statements, and, apparently, from an award of costs to OMPC. We say "apparently" because nothing in the briefing or at argument makes reference to this issue.

The facts show that, as an OMPC sales representative, West was responsible for promoting several OMPC drugs to customers within his assigned sales territory, including Holy Cross Hospital. One of the drugs was Levaquin. West worked with another sales representative in his territory, Cheryl Janicek.

West's supervisor for almost the entire time he worked for OMPC was Pascale. Pascale, if West is believed, had a rather nasty habit of making racially offensive statements. The seven which were excluded from the trial are, first, in

1997 that a "Caucasian could do a better job." In August 1998, he said his family lived on the south side of Chicago but that "blacks had run them out of the area." In September, he said "Blacks were stupid" and that "President Clinton wasn't doing anything but selling blacks out." In October 1998, he gave West's territory in the western Chicago suburbs to a white woman because "he believed that a white female would have a greater success." In the summer of 1999, Pascale told West to concentrate his efforts in Oak Park and Evergreen Park because he "did not like having to observe West in areas where Blacks and Hispanics were." That summer, he also said that "Hispanics and Blacks have nothing but babies and always end up on welfare." In the fall of that year, an African-American man arrived late for a picnic, and Pascale's comment was "just like a nigger, they're always late." These statements, as we said, were excluded by the court. The final statement, which was admitted, was that in March 2000, Pascale called West an "asinine nigger" or an "asinine black." West testified to the former on direct examination and the latter on cross.

But despite this evidence (again, if true) of Pascale's bias, OMPC says there is no discrimination. OMPC says that Pascale was not the decisionmaker on West's termination and that the termination was based on a company rules violation. In July 2000, West was concerned about the possibility that Holy Cross Hospital might replace OMPC's product Levaquin on formulary at the hospital with a product of a competing drug company, a product called Tequin. To convince Holy Cross to stay with Levaquin, West compiled a packet of materials (referred to as homemade materials because they were not prepared by the company itself). He says he obtained Pascale's approval of the materials and that the common practice at OMPC was that Pascale's approval was final. The materials included a Levaquin package insert, an article from "The Medical Letter," a copy of the product insert for Tequin, a copy of a fax from the Federal

Drug Administration to the manufacturer of Tequin, with a notation West made on the top that "FYI, FDA FINED COMPANY $17 MILLION FOR MISREPRESENTING PRODUCT," two articles from the *Wall Street Journal* discussing punitive damage awards, an article from a journal known as *Formulary*, and an article from the periodical *AmeriNet*. The real problem with the materials from OMPC's point of view, however, was the cover letter. And, importantly, Pascale denied seeing the letter before it was sent out; West, on the other hand, says he read it to Pascale over the telephone. West sent the materials to the then-interim president of Holy Cross and to 39 additional physicians and administrators associated with the hospital.

The cover letter said, in part:

> I implore you not to let Holy Cross Hospital become the victim of some huge punitive-damage award or ruin the hospital's image. . . . This could occur at Holy Cross because of an impending decision to replace the proven and safe Levaquin antibiotic with a new antibiotic that has no history and a dubious efficacy and safety profile, but is $2 dollars cheaper.

> The antibiotic under consideration to replace Levaquin . . . [h]as a **bolded** package insert warning regarding QTc prolongation (this could cause instantaneous death).

Janicek told Pascale that West sent the letter, and Pascale immediately contacted his supervisor, the regional business director Cathie Taylor, who asked him to fax it to her. Pascale and Taylor both contend that Pascale offered no opinion about whether the letter violated OMPC policy and made no recommendation regarding what action OMPC should take.

Taylor concluded that the cover letter violated several OMPC policies. She determined that it was an "unapproved

promotional piece" and therefore violated the rule against such materials, which include homemade sales materials:

> The company has always had a strong policy against the creation and use of unofficial sales materials. There are no exceptions. SALES REPRESENTATIVES FOUND TO HAVE ISSUED THEIR OWN SALES MATERIALS OF ANY KIND WILL BE SUBJECT TO TERMINATION.

Another rule violated, in Taylor's opinion, was the rule against the disparagement of competitors.

Taylor believed that the letter was a violation requiring discipline. She informed her superior and recommended that West's employment be terminated. Her recommendation was followed.

West contends that his testimony at trial raised an issue of fact for the jury that, in accordance with OMPC policy, Pascale approved his use of the homemade materials. West testified that he was treated differently than Pascale and Janicek, who were not terminated for violating the rule against homemade promotional materials. He testified that Pascale instructed West and other salespersons to violate company rules on several occasions. In short, West thinks Pascale encouraged him to prepare the materials and then used them against him, all out of racial bias.

Under that theory, West also contends Pascale was behind his termination. Pascale, as we said, provided a copy of the cover letter to Taylor. Taylor testified that Pascale "indicated" that he was not involved in approving the letter. Taylor did not investigate or question West about the circumstances surrounding the distribution of materials and never gave him a chance to speak in his own defense. Nevertheless, the district court found no evidence on which a reasonable jury could find for West and granted OMPC's Rule 50 motion.

Our review of a motion for judgment as a matter of law is *de novo. Mathur v. Bd. of Tr. of S. Ill. Univ.*, 207 F.3d 938 (7th Cir. 2000). We examine the record in its entirety and draw all reasonable inferences in favor of the nonmoving party; we do not make credibility determinations. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

The issue comes down to whether West presented sufficient evidence for a reasonable jury to find that Pascale authorized the distribution of the cover letter as part of a plan to get West terminated. The judge thought not. He concluded there was no evidence in the record that Pascale approved the cover letter. We disagree.

Although Pascale denied that he authorized the letter, West testified that the letter was sent to the hospital "under the authorization of my district manager, Walter Pascale." West said that he read the letter to Pascale over the telephone. At another point in his testimony, West said Pascale told him to "execute" and "disseminate" the information. He stated on cross-examination that Pascale asked him to send out the material. That is evidence, sufficient that a reasonable jury could rely on it, depending on its evaluation of the credibility of the witnesses.

West's theory also requires him to establish that Pascale influenced Taylor's decision to do the firing. Both Pascale and Taylor deny that he did. West does not claim that Taylor was biased against him, but he contends that Pascale was and that by failing to inform her that he authorized the cover letter, he deliberately tainted her decision, all as a result of racial bias.

But, of course, much of the evidence of racial bias was excluded, so we now consider whether the decisions to keep it from the jury should be upheld. We reject the defendant's contention that the issue was waived and thus review the evidentiary rulings for an abuse of discretion. *Thompson v. Boggs*, 33 F.3d 847 (7th Cir. 1994).

The court excluded the evidence on the basis that West did not allege a hostile work environment claim and therefore could not rely on *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), to bring in time-barred acts within the scope of this case.

*Morgan*, however, is not limited to hostile work environment claims. On claims other than hostile work environment claims, acts outside the statutory time period cannot be the basis for liability, but the statute does not "bar an employee from using the prior acts as background evidence in support of a timely claim." At 113. We have interpreted this language as allowing time-barred acts as support for a timely claim. In *Davis v. Con-Way Transportation Central Express, Inc.*, 368 F.3d 776, 786 n.4 (7th Cir. 2004), we said that *Morgan* made clear that "where, as here, the plaintiff timely alleged a discrete discriminatory act (*i.e.*, his termination based on his race and in retaliation for filing prior charges), acts outside of the statutory time frame may be used to support that claim." This is one of those rare occasions on which we find the exclusion to be an abuse of discretion.

The evidence, if true, clearly shows that Pascale was biased. Other evidence shows that he informed Taylor of West's apparent violation of company rules, that those rules were also violated by others, and that Taylor recommended firing West. It may be a close question whether West—who as we noted was proceeding pro se—was able to link these facts so as to enable a reasonable jury to find discrimination. But because a close question should go in West's favor, we find the case should have gone to the jury for its determination. On this record, we cannot say that no reasonable jury could find for West.

Accordingly, the judgment of the district court is VACATED and the case is REMANDED for a new trial. Costs are awarded to Mr. West.

**A true Copy:**

      **Teste:**

                  _____

                  *Clerk of the United States Court of*
                  *Appeals for the Seventh Circuit*