In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 07-1800

BARBARA FISCHER,

*Plaintiff-Appellant,*

*v.*

AVANADE, INC.,

*Defendant-Appellee.*

———————

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 5594—**William J. Hibbler**, *Judge.*

———————

ARGUED OCTOBER 26, 2007—DECIDED MARCH 14, 2008

———————

Before, POSNER, FLAUM, and ROVNER, *Circuit Judges.*

FLAUM, *Circuit Judge.* Plaintiff Barbara Fischer was an employee at Avanade, Inc. from May 2001 until her resignation in October 2005. During the course of her employment, Fischer was passed over on multiple occasions for a promotion to Delivery Management Practice Director ("Director") at the company. In 2005, Fischer brought a lawsuit against Avanade under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, alleging gender discrimination based upon a failure to promote and retaliation in the form of constructive discharge. On June 12, 2006, Defendant filed a motion for summary

judgment, which the district court granted on both claims. Fischer appeals this decision. For the reasons discussed below, we reverse with respect to Plaintiff's failure to promote claim and affirm on Plaintiff's retaliation claim.

## I. Background

Avanade, Inc. is a global corporation which assists companies in integrating Microsoft products into their business. Barbara Fischer, an Iowa resident with over twelve years of experience in the technology field, was hired by Avanade in May 2001 as a Program Management Consultant for Avanade's Central Region, which was headquartered in Chicago, Illinois. During Fischer's first two years at the company, before she began seeking Director positions, her performance reviews were mixed. After being reviewed as meeting the company's expectations her first year, in July 2002 Fischer was assigned to help Avanade break into the government opportunities arena. Although government agencies took note of Avanade's entry into the market, Avanade did not receive any government awards in 2002. This result, coupled with a negative review from Fischer's supervisor concerning a separate billable project, led to Fischer being rated as "does not meet expectations" for fiscal year 2002 and being placed on a performance improvement plan to perform at least one billable project successfully. Fischer formally disputed this evaluation, but her rebuttal was not placed in her personnel file. The next year however, Fischer dramatically improved her performance while serving as a Project Manager ("PM") on a billable project for the Federal Home Loan Bank of Chicago ("Bank"). Fischer managed five to six people on this project and was given strong reviews, with the

Central Region General Manager expressing that Fischer had done a "great job," and Fischer being rated as "exceeds expectations" for the 2003 fiscal year.

In September 2003, just before Fischer received her 2003 annual review, Avanade created a new Strategic Accounts Region designed to service its two largest accounts, one of which was the Bank. Howard Kilman named Joe Mendel the General Manager of this new region, which Fischer elected to join.

## A. October 2003 Opening for the Strategic Accounts Region Director Position

One month later, on October 5, 2003, General Manager Mendel circulated an email to all employees in the region informing them of open leadership positions in the Strategic Accounts Region, including that of Director. The announcement stated that the Director should be a member of the Strategic Accounts Region and have a billable project with a client of the region. The formal job description, in addition to its general requirements that the individual be entrepreneurial and possess skills in people interaction, problem-solving, and leadership, also listed the minimum requirements for the position:

- Proven track record in leading the delivery of consulting projects using Microsoft technologies . . .;

- Proven track record of leadership during opportunity and proposal phases of sales cycle;

- Enterprise experience with Microsoft Operating Systems or Development Tools;

- Demonstrated strong customer service with 10+ years experience;

- Established consulting expertise with 10+ years experience;

- Demonstrated understanding of development methodologies and tools;

- Interested and able to travel extensively on a regular basis.

Additionally, Avanade's general position summary for Director positions indicated that a university degree was also required.

Fischer applied for the Director position and apparently met these minimum qualifications. In addition, Fischer received the strong recommendation of the Bank's Assistant Vice President for the post.

Also applying for the position was Joe Sieverding, the employee ultimately promoted to the position in dispute in this suit. Sieverding had been hired as a Central Region PM in March 2003 and possessed thirteen years experience in the technology field, including ten years in consulting and success in managing larger technology projects. Upon being hired at Avanade, Sieverding was assigned to work on a project for the Bank which, at the time, was viewed as being largely over budget and delayed. Sieverding received an overall performance rating of "exceptional" for his work in 2003, but an audit of the project in October 2003 revealed that Sieverding's reliance upon a "handshake deal" had resulted in 200 undocumented change requests. In addition to violating Avanade's policies and procedures, this "handshake deal" allegedly contributed to Avanade's issuance of a rebate

and uncompensated work to the Bank in 2004 worth $600,000.

Mendel was in charge of the hiring decision and (after consulting with Howard Kilman on the matter) decided not to promote either Fischer or Sieverding to the Director position. Instead, in October 2003, Mendel decided to have both Fischer and Sieverding share the responsibilities of Strategic Accounts Region Director. That same month, Sieverding was promoted to a performance level of 60 on the company's sliding scale, which ranged from 20 to 70, and received an accompanying salary increase. Fischer expressed concerns to Mendel that Sieverding's higher performance level rating than hers would create difficulties in circumstances where Fischer needed to direct Sieverding. Mendel accordingly raised Fischer's status in late November, but only to Level 55, and did not increase her salary.

Additionally, beginning in 2003 and continuing into 2004, Fischer spoke to Mendel regarding her concerns about high cost "morale building" dinners attended by certain male employees, including Sieverding, that occurred at a gentleman's club. Mendel's response to Fischer was that, "Everybody is working really, really hard so let them do that. It was harmless." According to Fischer, subsequent to these complaints, Mendel was harsh on Fischer whenever she was sharp, abrupt, or curt in an email.

### B. March 2004 Re-Opening of the Strategic Accounts Region Director Position

In March 2004, Mendel reopened the Strategic Accounts Region Director position, submitting an official email to

this effect in mid-April. Fischer again expressed interest in this position and was highly recommended for the post by David Schmitt, Vice-President of the Bank. Also applying for the position was Robert Lewis. Statements made by Mendel as early as February of that year reflect that Lewis had already been deemed the presumptive frontrunner to receive the promotion.

At the time the opening was announced, Lewis was a Project Manager for the Central Region, rated at a Level 55, and had recently been assigned to assist on the same Bank project Sieverding had been on. Prior to joining Avanade in 2001, Lewis had compiled over seven years' experience in information technology and project management. In addition. before joining the Bank project, Lewis had worked on a $25 million project where he had managed 100 consultants. Notwithstanding this experience, Lewis did not meet all the formal qualifications that apparently had been required when the position was first opened in October 2003. In particular, Lewis had not obtained a university degree, did not hold ten years' consulting experience, and had not managed a project in the Strategic Accounts Region or been a member of that region.

In late April or early May, Mendel interviewed both Fischer and Lewis for the Director position. Mendel sought Kilman's approval on May 20 to offer the position to Lewis, and Lewis was subsequently awarded the position on June 1, 2004, resulting in a promotion to Level 60 and a salary raise.

### C. May 2004 Position as Acting Director for the Central Region

In May 2004, at approximately the same time Mendel was hiring for the Strategic Accounts Region Director position, the same position in the Central Region became available. Fischer was never given an opportunity to apply for this position. Gary Gamso, the departing Central Region Director, and Don Evans, the Central Region Operations Manager at the time, were in charge of filling the role. Without posting the opening, Evans and Gamso approached Sieverding to serve as acting Director. Mendel, who had earlier expressed interest in moving Sieverding out of the Strategic Accounts Region, provided feedback on Sieverding before he was offered the position. That same month, when Fischer asked Mendel why Sieverding had not applied for the Strategic Accounts Region Director position, Mendel replied, "Sieverding is not practice director material."

Sieverding was offered the acting position and assumed the duties of Central Region Director in late May 2004. Following the announcements that Lewis and Sieverding had been named to their respective Director positions, Fischer approached Tracy Spielmann, Human Resources Generalist about these decisions, asking, "How does— was this all set up?", to which Spielmann replied, "Oh, no."

### D. October 2004 Permanent Central Region Director Position

In October 2004, without posting the position or receiving an application from Sieverding, Evans permanently appointed Sieverding to the role of Central Region Director. Fischer, meanwhile, continued to work on the

Bank project until December 2004 and then stayed on at Avanade until October 2005.

### E.   Fischer's Continued Employment at Avanade

In addition to Fischer's complaints regarding the dinners at the gentleman's club and inquiry as to whether Lewis' and Sieverding's promotions were "all set up," she also joined a number of women in collectively raising concerns regarding women's experiences at the company. On April 11, 2005, Fischer and a number of other senior level women at Avanade engaged in a conference call with Mitch Hill, Avanade's CEO, and Eric Friedman, Avanade's Human Resources Director, to address this issue. This meeting was to be about general women's concerns and no specific incidents of unfair treatment or discrimination were discussed. Fischer identified herself by name at the meeting after Hill indicated that "anonymity did not work for him," and that, in order to assist the women, he would need to know who they were. Although Avanade failed to hold a follow-up meeting despite requests by the women's spokesperson, Avanade did hire an outside consultant which held a training session on women's issues on July 26, 2005, and the company implemented a diversity awareness program for the 2006 fiscal year.

The same month that the meeting with Hill occurred, Fischer began working on a new project with Francis Delgado, an Avanade Connected Methods Senior Project Manager. By mid-June Delgado had relayed to Lewis that she was considering taking Fischer off the project due to a lack of communication and activity on Fischer's part. By June 20, 2005, Delgado told Lewis that these

concerns had not been addressed and that she was going to assign Fischer's responsibilities to someone else. Lewis then relayed this information on June 21 to Mick Slattery, the Strategic Accounts General Manager, who instructed Human Resources to review Fischer's time entries for the week of June 15, a standard practice when issues involving an employee's work habits, expense reimbursements, or time entries exist. Slattery's own concerns regarding Fischer's lack of communication, lack of attendance at leadership meetings (although Fischer contends she was not informed that she needed to attend any such meetings), and undefined work schedule led him to inform Lewis and Human Resources Generalist Spielmann that he intended to record Fischer's progress as "does not meet expectations" or "requires improvement." Moreover, Slattery wanted Human Resources to monitor Fischer's time entries for the remainder of the year, due to his concerns regarding the amount of time Fischer had taken off that year and the small amount of billable work she had performed. Although Slattery's request was only for Fischer's time entries, Spielmann also reviewed Fischer's expense reimbursement requests, finding what appeared to be unauthorized reimbursement requests for cell phone and broadband expenses. Sometime after July 21, 2005, Fischer was approached about these expenses, which she claimed had been authorized by Mendel, although she was unable to produce emails documenting such authorization at the time.

During this period of time, Avanade was also in the process of preparing to dismantle and restructure the Strategic Accounts Region. The decision to go forward with this restructuring was made in April 2005, with the Region's change to the U.S. Delivery Center to be effective as of October 1, 2005. On July 19, 2005, Slattery told

Fischer that as part of the restructuring, all U.S. Delivery Center employees would need to be based full-time in Chicago. Soon after talking with Fischer, Slattery had a similar conversation with Dan Egleston, a Strategic Accounts Solutions Developer, informing him that he too would have to relocate to Chicago if he wished to work in Avanade's U.S. Delivery Center. Slattery, however, had failed to mention any such requirement during an earlier slide presentation on the restructuring that Fischer had seen. Fischer replied that she wanted to stay in Iowa, and Slattery said that in order for her to do so she would need to transfer to a position in the Central Region or another region for the upcoming fiscal year.

Two days later, on July 21, 2005, Fischer filed her first EEOC charge against Avanade. Spielmann received notice of this charge and relayed this information to Slattery and Lewis. Following this charge, Director of Human Resources Friedman contacted Fischer, stating: "I must admit I am a little speechless. What is it that you are looking for? Are you looking for a new role within Avanade, a transfer to another region, money?" Fischer replied, "No, not really. I am just looking for Avanade to start making things right again."

In August 2005, Slattery issued a negative assessment of Fischer on her Personal Contribution Form. Earlier, on August 6, Lewis had recommended to Slattery that he not issue the form, since "providing this feedback at this time would seem like retaliation." When Slattery formally issued the Personal Contribution Form later that month, it included a negative assessment for Fischer's participation on a leadership team, although Fischer was not aware that she had been placed on any such team.

At the end of August, Mendel offered Fischer a position in the Central Region after being told by Slattery that Fischer did not intend to relocate to Chicago. This was a lateral position working in government opportunities, with no change in official title, salary, benefits, or primary responsibilities. Fischer accepted this position in mid-September. At the end of the month however, on September 30, 2005, Fischer submitted her resignation, effective October 15, 2005, after being offered a higher paying position at another company.

### F.   Procedural History

Fischer filed this suit against Avanade on September 28, 2005, bringing a claim of sex discrimination for failure to promote, in violation of Title VII of the 1964 Civil Rights Act, as amended. 42 U.S.C. § 2000e *et seq*. Fischer later amended the complaint to include a claim of retaliation in response to her complaints about sex discrimination. Avanade then filed a motion for summary judgment on both counts on June 12, 2006.

Fischer raised certain procedural objections to Avanade's summary judgment practice. With respect to information offered by Avanade in its Statement of Material Facts, Fischer objected to Avanade's reliance upon compensation data and time and expense records provided by two witnesses, Eric Tuch and Deborah Mitrenga, who had not been earlier disclosed to Fischer. The district court ruled in a June 26, 2006 Minute Entry that Avanade would be permitted to rely on these declarations. Fischer also argues that the district court erred in considering declarations submitted by already deposed witnesses, claiming that these declarations contradicted their deposition

answers. The district court did not expressly rule for one side or the other on this issue, but seemingly with one exception, did rely on these declaration statements as part of the factual record.

The district court, on March 30, 2007, granted Avanade's motion for summary judgment on both counts. Fischer appeals the district court's decision on the claims of sex discrimination and retaliation in the form of constructive discharge.

## II. Analysis

### A.  Standard of Review

This court reviews a grant of summary judgment *de novo*, examining the record in the light most favorable to the non-moving party. *Lawson v. CSX Transp., Inc.*, 245 F.3d 916, 922 (7th Cir. 2001). A grant of summary judgment is to be affirmed where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). All facts and reasonable inferences are to be construed in favor of the nonmoving party, *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007), however, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

### B.  Sex Discrimination Claim for Failure to Promote

Fischer first appeals the district court's grant of summary judgment with respect to her failure to promote

sex discrimination claim. Fischer argues that sex discrimination was at the root of her failure to obtain promotions to the Strategic Accounts Region Director position in October 2003 and May 2004, as well as to the same position in the Central Region in May 2004 and October 2004. The district court found however, and Fischer concedes on appeal, that Title VII's 300-day limitation period for filing a charge with the EEOC bars Fischer from holding Defendant liable for any discrete discriminatory acts occurring before September 24, 2004. *See* 42 U.S.C. § 2000e-5(e)(1); *see also AMTRAK v. Morgan*, 536 U.S. 101, 113 (2002) ("discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"). Thus, Fischer's only timely failure to promote claim concerns Sieverding's permanent appointment to the role of Central Region Director in October 2004. This does not mean, however, that these earlier, time-barred incidents are irrelevant. Rather, "time-barred acts [are allowed] as support for a timely claim." *West v. Ortho-McNeil Pharm. Corp.*, 405 F.3d 578, 581 (7th Cir. 2005) (citing *Davis v. Con-Way Transportation Central Express, Inc.*, 368 F.3d 776, 786 n.4 (7th Cir. 2004)); *Morgan*, 536 U.S. at 113 (Title VII does not "bar an employee from using the prior acts as background evidence in support of a timely claim.")

In light of this 300-day limitations period, we turn to whether the district court erred in granting summary judgment on Fischer's sex discrimination claim with respect to her failure to be promoted to the permanent Central Region Director position in October 2004. A failure to promote claim can be established through either the direct method of proof or the indirect burden-shifting method established in *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973). *Volovsek v. Wis. Dep't of Agric., Trade, & Consumer Prot.*, 344 F.3d 680, 689, 692 (7th Cir. 2003).[1] The prima facie case for a failure to promote claim under the indirect method requires that the plaintiff show: "1) [s]he belongs to a protected class, 2) [s]he applied for and was qualified for the position sought, 3) [s]he was rejected for that position and 4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Grayson v. City of Chicago,* 317 F.3d 745, 748 (7th Cir. 2003). Under this burden-shifting method, once the plaintiff has established the prima facie case, the burden shifts to the defendant to set forth evidence supporting a finding that the employment decision was made on a non-discriminatory basis. *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 629 (7th Cir. 1996). If the defendant is successful in presenting a legitimate, non-discriminatory basis for not promoting the plaintiff, the burden then shifts again to the plaintiff to show that the defendant's proffered explanation is a pretext for discrimination. *Id.*

At issue between the parties is the fourth prong of the prima facie case[2]—whether Fischer was as qualified as

---

[1] Although Fischer claims she is able to offer sufficient evidence under either method, she presents no analysis under the direct method and proceeds solely under the indirect method of proof. Accordingly, we similarly limit our analysis to Fischer's claim under the indirect method.

[2] At first blush, Fischer apparently fails to meet the second element of the prima facie case, since she did not apply for the Central Region Director position. In cases such as this, however, where the plaintiff alleges that there were discriminatory motives behind not announcing the position to her, Fischer

(continued...)

Sieverding for the Central Region Director position. Defendant claims Sieverding was made the permanent Central Region Director based upon the fact that he successfully demonstrated, while serving in the acting capacity, that he had the ability and willingness to meet the responsibilities of the permanent post. Accordingly, Defendant argues that Fischer cannot show that she was similarly qualified for the position, since she had never served as acting Central Region Director. This argument alone, however, cannot carry the day. While Sieverding's appointment to the permanent Central Region Director position is Fischer's only timely claim, Avanade's time-barred acts may still be used to support her timely claim. *See West v. Ortho-McNeil Pharm. Corp.*, 405 F.3d at 581. This is particularly true in a circumstance like this, where Sieverding's appointment to the acting Central Region Director position, which Fischer claims was made on a discriminatory basis, is the sole reason offered by Defendant for Sieverding's subsequent promotion to the permanent post.

Looking then to Fischer's and Sieverding's respective qualifications when Sieverding was named acting Central Region Director in May 2004, we find that these two individuals were similarly situated, thus satisfying the fourth prong of the prima facie case. Both Fischer and Sieverding came to Avanade with over ten years' experience in the technology field, and both entered at a

---

[2] (...continued)

only needs to show that, "had [Avanade] approached her, she would have accepted the offered position," which Defendant does not contest. *Loyd v. Phillips Bros., Inc.*, 25 F.3d 518, 523 (7th Cir. 1994).

Level 3 skill level. Furthermore, Fischer and Sieverding had both worked on projects for the Bank prior to the two jointly sharing the responsibilities of Strategic Accounts Region Director in October 2003. As for Fischer, she had managed three to four concurrent projects for the Bank and received the strong recommendation of the Bank's Assistant Vice President for the Strategic Accounts Region Director position in October 2003 and the high recommendation of the Bank's Vice President when the position re-opened in 2004. With respect to Sieverding, he was brought on to lead a project that was facing numerous problems, particularly with respect to its original budget and release date, when he was brought on board. Although Sieverding oversaw a group ranging in size from twenty to ninety while at the Bank, the parties dispute Sieverding's success on the project. Fischer in particular points to the fact that Sieverding's reliance upon a "handshake deal" for 200 undocumented change requests apparently led Avanade to have to issue a rebate and provide uncompensated work to the Bank totaling $600,000. Avanade's reference to Sieverding's "exceptional" rating in 2003 and promotion to Level 60, compared to Fischer's "exceeds expectations" rating and promotion to Level 55, is insufficient to disprove that the individuals were similarly situated, particularly when the promotion level disparity is allegedly the result of discrimination. For these reasons, we find that Fischer has offered sufficient evidence to meet this fourth prong and show a prima facie case against Avanade.

Having shown sufficient evidence to make a prima facie case of discrimination under the indirect method, the burden then shifts to Avanade to show a legitimate, non-discriminatory basis for hiring Sieverding to the Central Region Director position. *See Debs v. Northeastern Ill. Univ.,*

153 F.3d 390, 395 (7th Cir. 1998) ("Once the plaintiff establishes this prima facie case, there is a presumption of discrimination that obligates the employer to produce a legitimate nondiscriminatory reason for its decision."). Defendant claims that Evans promoted Sieverding to the permanent Central Region Director position based upon the fact that while serving in the acting role, Sieverding had performed well and displayed his ability to fulfill the position's responsibilities. While we recognize that Sieverding's promotion to the permanent Central Region Director position is Fischer's only timely claim, we note that with respect to Sieverding's promotion to the acting position, Avanade offers that this decision was based on Sieverding's present availability, interest in the Central Region, experience managing a large project, and ability to handle the position. Having offered these legitimate, non-discriminatory reasons for hiring Sieverding, the burden shifts back to Fischer to show that this proffered explanation is pretextual.

"Pretext is a 'lie, specifically a phony reason for some action,'" *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 737 (7th Cir. 2006) (quoting *Russell v. Acme-Evans, Co.,* 51 F.3d 64, 68 (7th Cir. 1995)), and thus, "[t]o show pretext, 'a plaintiff must show that [(1)] the employer's nondiscriminatory reason was dishonest; and [(2)] the employer's true reason was based on a discriminatory intent.'" *Brown v. Ill. Dep't of Natural Res.,* 499 F.3d 675, 683 (7th Cir. 2007) (quoting *Perez v. Illinois,* 488 F.3d 773, 777 (7th Cir. 2007)). This can be done with either direct or indirect evidence. If the plaintiff proceeds to offer indirect evidence, "the plaintiff must show that the employer's reason is not credible or that the reason is factually baseless." *Id.* (quoting *Perez,* 488 F.3d 777-78). In addition, "'[the plaintiff]

must also provide evidence of at least an inference that the real reason for [the adverse employment action] was discriminatory.' " *Id.* (quoting *Perez*, 488 F.3d 777-78). Furthermore, when a defendant has offered multiple non-discriminatory reasons for its hiring decision, showing that one of these reasons is pretextual is not enough, although there may be circumstances where "multiple grounds offered by the defendant . . . are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment." *Russell*, 51 F.3d at 69-70. As part of her offer of evidence of pretext, Fischer is permitted to look to events occurring prior to the 300-day limitations date. *Davis*, 368 F.3d at 786 n.4. Thus, Fischer's time-barred claims regarding Lewis' and Sieverding's promotions in May 2004 to Directors of the Strategic Accounts and Central Regions, respectively, are relevant.

With these governing principles in mind, we turn to Fischer's evidence of pretext. First, Fischer argues that not only was she as qualified as Sieverding for the permanent Central Region Director position, but that she was in fact more qualified than Sieverding for this post. Fischer, however, is unable to support this argument with respect to the permanent Central Region Director position and is only able to offer reasons why she was more qualified than Lewis for the Strategic Accounts Region Director position and more qualified than Sieverding for the acting Central Region Director post. Defendant claims that Sieverding was named to the permanent post based upon his demonstrated ability and enthusiasm while serving in the acting Director capacity. Regardless of whether Fischer's performance was superior to Sieverding's at the Bank, or whether Fischer was the superior candidate

for the acting Director position, Fischer has offered no evidence to directly contest Sieverding's performance while serving in the acting capacity aside from Laura Rafferty's testimony that upon coming to the acting Director position, Gamso described Sieverding as "practically clueless." By failing to offer any evidence beyond this, Fischer falls short of clearing the high hurdle necessary to establish pretext through reference to her own superior qualifications for the position. As this Court has stated, "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." *Mlynczak v. Bodman*, 442 F.3d 1050, 1059-60 (7th Cir. 2006) (citing *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1180 (7th Cir. 2002)). Despite Fischer's arguably superior qualifications to Sieverding's for the acting Director position, Fischer has failed to establish that "no reasonable person" could have chosen Sieverding over Fischer for his subsequent permanent appointment to the post. This, however, does not end the inquiry into pretext. The district court erred in appearing to make such a showing mandatory, stating that Fischer "*must* establish" the superiority of her credentials according to this standard in order to show pretext, rather than fully acknowledging that Fischer can establish pretext through other direct or indirect evidence as well. We thus turn to Fischer's other arguments of pretext.

The most compelling evidence of pretext involves Joseph Mendel's role in the entire promotion process.

Fischer has offered testimony by Laura Rafferty[3] that, if found credible by a jury, would show that as early as February 2004, Mendel had pre-ordained that Lewis would have fast-track status to the Strategic Accounts Director position and Sieverding was to be moved to the Central Region. According to Rafferty, in February or March 2004, before Lewis came to the Strategic Accounts Region, Gary Gamso, the Central Region Director at the time, informed her of Mendel's intention to move Sieverding out of the Strategic Accounts Region and bring in Lewis to fill the Director position. According to Rafferty, Gamso related to her that Mendel had re-quested Sieverding be removed from the Strategic Ac-counts Region, apparently due to performance concerns, and that, since they had no other place to put him, were going to move him into the Central Region. Gamso then relayed to Rafferty that Mendel desired to bring Lewis into the Strategic Accounts Region for 90 days, after which, if he had a good relationship with the Bank, he would be promoted to Director.[4] Lewis' streamlined path

---

[3] Rafferty also served as the women's spokesperson during their meeting with Avanade's CEO on April 11, 2005.

[4] Defendant lodges a general hearsay objection to this evid-ence being considered. Despite the double hearsay flavor of this testimony, "[a] statement is not hearsay if . . . the statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." *Williams v. Pharmacia, Inc.*, 137 F.3d 944, 950 (7th Cir. 1998) (quoting FED. R. EVID. 801(d)(2)(D)). We find that both Mendel's and Gamso's statements appear to be related to matters within the scope of their agency or employment, since Mendel made the determination to hire Lewis (albeit with
(continued...)

to the Strategic Accounts Region Director position prior to its posting is corroborated by the fact that in February, Howard Kilman documented that Lewis was a "potential [Director] for Joe [Mendel]," and that he needed to help Lewis "understand the [opportunity]." Similarly, Mendel's alleged displeasure with Sieverding's performance is corroborated by Mendel's statement to Fischer on May 26, 2004 that "Sieverding is not practice director material."

Fischer is also able to offer evidence creating an inference that Mendel's actions were based on sex discrimination. Defendant does not dispute that in both 2003 and 2004, Mendel was dismissive of Fischer when she raised concerns regarding male employees enjoying company-paid dinners at a gentleman's club. Fischer further asserts that it was after raising this complaint that Mendel began criticizing her people skills. In addition, according to Fischer, when Mendel determined that Fischer and Sieverding would share the duties of Strategic Accounts Region Director, Mendel promoted Sieverding to a Level 60, but after Fischer expressed concerns about this inequality, only raised Fischer's status to Level 55.

The degree to which this evidence regarding Mendel is material to Fischer's timely claim, however, depends upon whether Fischer can establish that Mendel's allegedly

---

[4] (...continued)

Kiman's approval) and Gamso, along with Evans, was responsible for hiring Sieverding to the acting Central Region Director position. As a result, we will consider this evidence on this appeal. *See Schindler v. Joseph C. Seiler & Synthes Spine Co., L.P.*, 474 F.3d 1008, 1010 (7th Cir. 2007) ("In order to defeat a motion for summary judgment, a plaintiff must present admissible evidence that raises a genuine issue of material fact.").

discriminatory actions implicate the reasons proffered by Defendant as to why Gamso and Evans named Sieverding to the acting and permanent Central Region Director positions. We find Fischer has provided sufficient evidence such that a reasonable jury could find that Defendant's legitimate, non-discriminatory reasons for hiring Sieverding over Fischer were pretextual. First, Gamso and Evans jointly engaged in soliciting Sieverding and determining that he should be appointed to the acting Director role, and based on Rafferty's testimony, Gamso was aware of Mendel's desire to move Sieverding to the Central Region due to performance concerns. Thus, Gamso's awareness of Mendel's concerns and motivations regarding Sieverding is sufficient to raise a material question of fact as to whether Defendant's proffered reason for soliciting Sieverding for the acting position—that they felt he was qualified and capable of fulfilling the Director responsibilities—was pretextual. Furthermore, Mendel's prior statement to Gamso, as well as his statement to Plaintiff that "Sieverding is not practice director material," is at odds with the allegedly good review Mendel gave regarding Sieverding as part of the hiring process for the acting Director position. Furthermore, Mendel's influence went beyond Sieverding's initial transfer to the Central Region and extended to Sieverding's appointment to the permanent Central Region Director role, since Evans sought Mendel's approval of this promotion.

As an additional matter, Evans' proffered reason for naming Sieverding rather than Fischer to the Central Region Director position also demands scrutiny. On appeal, Fischer launches a broad attack at declarations offered by seven witnesses who had been previously

deposed by Fischer's counsel.[5] Fischer claims that these declarations included statements that were new, contradictory, and beyond the testimony given at the depositions and thus reveal a concocted sham defense on Avanade's part requiring reversal of summary judgment. This includes a specific charge against Evans' testimony.

At his deposition on April 14, 2006, Evans was asked why Fischer had not received the acting Central Region Director position. Evans simply replied, "I appointed Joe Sieverding to the role." Then, on June 12, 2006, the same date Avanade filed its motion for summary judgment, Evans submitted a new declaration, purporting to explain why Fischer would not have received the acting Director position even if she had expressed interest in it. In the declaration, Evans stated that he did not know if Fischer was interested, or if her workload would allow a transition to the Central Region. Additionally, Evans declared that it was his understanding that Sieverding had more experience in managing large projects.

---

[5] Fischer also raises other procedural concerns with respect to Defendant's motion for summary judgment that do not carry the day. First, Fischer fails to develop any argument or cite any authority regarding her throwaway charge that Defendant misguided the district court by presenting a Statement of Material Facts on summary judgment which purported to represent the entire record. Fischer's second claim, that Defendant was improperly permitted to rely upon two declarations from witnesses who had not been disclosed during discovery also fails, since Fischer has failed to show how the district court's decision that Defendant could rely on these declarations amounted to an abuse of discretion. *See Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995) ("Because the district court is far better situated to pass on discovery matters, we review its discovery decisions for an abuse of discretion.").

This Court has stated that "[a]ffidavits, . . . when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). Accordingly, Fischer argues that Evans' declaration contradicts his earlier deposition testimony on this issue. Defendant in contrast, argues that these statements are not contradictory, and observes that "where the deposition testimony is ambiguous or incomplete, . . . the witness may legitimately clarify or expand upon that testimony by way of an affidavit." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999). According to Defendant, Evans' declaration statement answers a hypothetical question not asked at the deposition—whether Fischer or Sieverding would have been more qualified for the acting Director position, had Fischer in fact applied for the job.

We find that Evans' more fulsome testimony in his declaration cannot be said to contradict his earlier, curt response at his deposition.[6] However, Defendant's failure to fully address until Evans' declaration why Fischer would not have received the position does raise credibility concerns. *See Wilson v. AM General Corp,* 167 F.3d 1114, 1121 (7th Cir. 1999) (affirming denial of judgment notwithstanding the verdict with respect to jury's finding of pretext, based in part on jury's credibility determina-

---

[6] Fischer lodges this same argument with respect to two matters to which Mendel testified in both his deposition and subsequent declaration. Because there is already compelling evidence of pretext as it relates to Mendel, we do not address this charge in greater detail.

tion regarding Defendant's failure to disclose reason for termination until discovery, despite being directly asked at time of termination); *see also Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) (genuine issue of material fact with respect to pretext exists when specific reason for promoting one employee over the plaintiff was not disclosed until after litigation, which "might suggest … a later fabrication"). Fischer provided Defendant with at least two opportunities prior to the submission of Evans' declaration to explain why she was not named to the acting Director position. In late May, following Lewis' and Sieverding's moves to their respective Director positions, Fischer approached Human Resources Generalist Tracy Spielmann about whether these promotion decisions were "all set up." Spielmann simply responded, "Oh, no," failing to provide Fischer with any further clarification regarding Defendant's hiring decisions. Then, at Evans' deposition, although he provided reasons for selecting Sieverding, his only response when directly asked why Fischer did not receive the acting Director position was, "I appointed Joe Sieverding to the role." While Evans' more complete declaration statement is not inconsistent with Defendant's prior responses, this late justification for why Fischer would not have been hired, provided at the eleventh hour in conjunction with Defendant's motion for summary judgment, raises a genuine issue of material fact as to whether this justification is a later fabrication on Defendant's part. Furthermore, the first reason Evans offers in his declaration for not hiring Fischer—that Evans did not know if she was interested in leaving her current position—borders on the illogical if Evans is answering, as Defendant maintains, why he would not have hired Fischer even if she had in fact expressed interest in the position.

For these reasons, we find that Fischer has presented sufficient evidence to raise a genuine issue of material fact as to whether Defendant's promotion of Sieverding to the acting Central Region Director position was pretextual. Furthermore, with respect to Sieverding's appointment to the permanent Central Region Director post, the individuals with authority over this decision were largely the same, seeing as Evans made the decision, with Mendel's approval, to name Sieverding to the permanent post. Additionally, here too, when Evans was asked at his deposition why Fischer was not awarded the permanent position, Evans responded, "Joe Sieverding was appointed to the role." It was not until Evans' declaration that Defendant disclosed its justification for naming Sieverding to the permanent position, namely, Sieverding's performance in the acting capacity. Based on the evidence offered by Defendant, Sieverding's appointment to the permanent position can be seen as the last step in a scheme to fast-track Lewis into the Strategic Accounts Region's Director position and switch Sieverding into the Central Region, leaving Fischer without a Director role. While this theory largely depends upon credibility determinations, most notably regarding Laura Rafferty's testimony and Defendant's eleventh hour justifications, credibility is not an issue to be resolved at summary judgment, but is one reserved for the jury. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) ("On summary judgment a court may not make credibility determinations"). If Fischer's evidence is deemed credible by a jury, Sieverding's appointment to the permanent Central Region Director position becomes sufficiently intertwined with the earlier promotions of Lewis and Sieverding that the evidence of pretext from Fischer's time-barred claims would similarly support a finding that the reason offered

for Sieverding's promotion to the permanent post was also pretextual. *See Russell*, 51 F.3d at 70 ("There may be cases in which the multiple grounds offered by the defendant for the adverse action of which the plaintiff complains are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment."). Accordingly, because Fischer has raised a genuine issue of material fact as to whether Defendant's proffered non-discriminatory reason for naming Sieverding to the permanent Central Region Director position was pretextual, we reverse the grant of summary judgment on this claim.

### C. Retaliation in the Form of Constructive Discharge

Fischer also appeals the district court's grant of summary judgment on her claim that Defendant, in violation of Title VII, constructively discharged her in retaliation for her complaints of sex discrimination. *See Sitar v. Ind. DOT*, 344 F.3d 720, 727 (7th Cir. 2003) (citing 42 U.S.C. § 2000e-3(a)); *see also Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1032 (7th Cir. 2004) (discussing how constructive discharge can serve as the adverse employment action in a retaliation claim). This too can be proved through either a "direct method" or "indirect method." *See Phelan v. Cook County*, 463 F.3d 773, 787-88 (7th Cir. 2006). Unlike Fischer's failure to promote claim, here she proceeds under the direct method. Under this approach, summary judgment must be denied if Fischer presents "direct evidence . . . that [s]he engaged in protected activity . . . and as a result suffered the adverse employment action of which [s]he complains." *Id.* at 787 (quoting *Stone v. City of Indianapolis Public Utilities Division*, 281 F.3d 640, 644 (7th Cir. 2002)). Summary judgment may still be

granted however, if Defendant then "presents unrebutted evidence that he would have taken the adverse employment action against the plaintiff even if he had no retaliatory motive." *Id.* at 787-88 (quoting *Stone*, 281 F.3d at 644). In order to show a retaliatory motive on Defendant's part under the direct method, Plaintiff can "present[ ] sufficient circumstantial evidence such that a jury could infer retaliation." *Id.* at 788 (citing *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (2005)).

Here, Fischer claims that she engaged in protected activity that led to her being constructively discharged from Avanade.[7] Constructive discharge does constitute an adverse employment action and is deemed to have occurred when "the plaintiff . . . show[s] that she was

---

[7] In its brief, Defendant also addresses whether its specific, allegedly retaliatory acts against Fischer, each taken on its own, merit a separate finding of retaliation. Fischer's brief however, is clear that she is appealing the lower court's grant of summary judgment only on Fischer's claim that Defendant retaliated against her in the form of constructive discharge. For example, Fischer's "Statement of Issues Presented for Review" is specifically limited to the already discussed sex discrimination claim and her claim "that Defendant constructively discharged Fischer in retaliation for complaining of sex discrimination." Similarly, the "Conclusion" of Fischer's brief, with respect to her retaliation claim, states only that, "A reasonable jury could also find that Avanade retaliated against Fischer in response to her complaints of sex discrimination by impairing her terms and conditions of employment in a manner that compelled her to resign." Because Fischer has declined to argue on appeal that any of these individual incidents constitute discrete, cognizable, incidents of unlawful retaliation, we decline to take up that argument *sua sponte*.

forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *EEOC v. Univ. of Chicago Hosps.*, 276 F.3d 326, 331 (7th Cir. 2002). Constructive discharge can take on two different forms. The district court analyzed Fischer's claim under the first form, where an employee resigns due to alleged discriminatory harassment. *Id.* Under this approach, "we require the plaintiff to demonstrate a discriminatory work environment 'even more egregious than the high standard for hostile work environment.'" *Id.* at 331-32 (quoting *Tutman v. WBBM-TV, Inc.*, 209 F.3d 1044, 1050 (7th Cir. 2000), *cert. denied*, 531 U.S. 1078, 148 L. Ed. 2d 675, 121 S. Ct. 777 (2001)). Fischer contends that the second form is more fitting to her claim—that, "[w]hen an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated, and the plaintiff employee resigns, the employer's conduct may amount to constructive discharge." *Id.* at 332. In other words, constructive discharge also occurs where, based on an employers actions, "'the handwriting [was] on the wall' and the axe was about to fall." *Id.* (quoting *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998)).

The first matter to address is whether Fischer engaged in "statutorily protected activity." An employer cannot discriminate against an employee for voicing opposition to employment practices deemed unlawful under Title VII, *Worth v. Tyer*, 276 F.3d 249, 265 (7th Cir. 2001), but at the same time, "the [employee's] complaint must indicate the discrimination occurred because of sex, race, national origin, or some other protected class." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006); *Sitar*, 344 F.3d at 727 ("Although an employee need not

use the magic words 'sex' or 'gender discrimination' to bring her speech within Title VII's retaliation protections, 'she has to at least say something to indicate her [gender] is an issue.' ") (quoting *Miller v. Am. Family Mutual Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000)). Here, Defendant concedes that Fischer's participation in the April 11, 2005 conference call with Avanade's CEO and her filing of an EEOC charge on July 21, 2005 constituted "protected activity." Fischer contends however, that her complaints in 2003 and 2004 to Mendel regarding "morale building" dinners at a gentleman's club, as well as her questioning Human Resources Specialist Spielmann as to whether Lewis' and Sieverding's promotions were "all set up," also constitute statutorily protected activity. We need not decide this issue, because regardless of whether Fischer's first statutorily protected act occurred in 2003 or April 11, 2005, Fischer has not shown that Defendant's alleged response to these actions indicated that the "axe was about to fall" when Fischer submitted her resignation on September 30, 2005.

Fischer points to a series of events that she claims reflect that "the handwriting was on the wall" regarding Avanade's intent to terminate her: 1) the audit of her cellular and broadband expenses following the filing of her EEOC charge; 2) Director of Human Resources Friendman asking Fischer, after she filed her EEOC charge, "What is it that you are looking for . . . a new role within Avanade, a transfer to another region, money?"; 3) General Manager Slattery's August 2005 negative assessment of Fischer's participation on a leadership team; 4) what Fischer expected to be a forthcoming, negative annual review from Practice Director Lewis; 5) Defendant requiring Fischer to either move to Chicago to maintain her current position, or else transfer to another region; and

6) only offering Fischer one transfer option—to government opportunities, a historically difficult line of work. Fischer then places these incidents against the backdrop of an alleged environment at Avanade where women are discriminated against.

Although Fischer has set forth a long list of incidents which she claims support a finding of constructive discharge, we cannot say that these incidents, when viewed in the aggregate, would cause a reasonable person to believe that the writing was on the wall regarding Fischer's future at Avanade. We reach this conclusion despite the fact that, as Fischer correctly points out, the Supreme Court in *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S.Ct. 2405, 2415-16 (2006), did not limit what constitutes a materially adverse employment action to a specified list of actions, as the district court did below. Instead, under *Burlington Northern*, the question is whether, when considering the particular circumstances and context of this case, a reasonable person in the plaintiff's position would have found the action materially adverse. *Id.* The fact however, that under such a standard this Court may consider an employer's exploitation of a particular employee's vulnerabilities, *see Washington v. Ill. Dep't of Revenue,* 420 F.3d 658, 662 (7th Cir. 2005), does not mean that exploitation of that kind has occurred here. Fischer fails to point to any details, aside from perhaps her prior negative experience working in government opportunities, that make any of the incidents she references particularly unique or egregious to her circumstances. Even with respect to her transfer however, this cannot be said to be materially adverse when the government opportunities position was offered as an alternative to participation in a department-wide restruc-

turing, and the new position allowed Fischer to maintain her current title, salary, benefits, and primary responsibilities.

We are mindful of the fact that the incidents described by Fischer—an audit, negative performance reviews, and a requirement to either relocate or transfer departments—are not circumstances an employee would wish upon herself. A look at cases where evidence of constructive discharge has been found to exist however, reveals that the incidents Fischer references are insufficient to establish that her "working conditions . . . had become unbearable." In *University of Chicago Hospitals* for example, this Court found that "the writing was on the wall" when, after the employee had been warned of her employer's intention to terminate her and having been told that a mistake on her part was "the last straw," the employee arrived at work after vacation only to find her desk packed up, boxes piled up, and her office being used for storage. 276 F.3d at 332. Similarly, in *Neal v. Honeywell, Inc.,* this Court affirmed a jury's finding of constructive discharge when the plaintiff suffered a drastic reduction in duties following her whistle-blowing action, was made to feel like a "traitor" by her supervisor for this action, and could not be assured that she would be kept safe at work from the person she had ratted out. 191 F.3d 827, 830-31 (7th Cir. 1999). Here, despite the audit and the negative assessment by Slattery, unlike *University of Chicago Hospitals,* Fischer has not pointed to any evidence indicating that there had even been so much as a whisper on Avanade's part of a desire to terminate her. To the contrary, when Fischer decided to opt out of the relocation requirement for the restructured U.S. Delivery Center, Slattery and Lewis assisted Fischer in locating an

alternative PM position. Moreover, unlike *Neal*, no reduction in duties occurred. Rather, Fischer, after declining to relocate, was given a parallel position in a different department where she maintained the same title, salary, benefits, and primary responsibilities.

That being said, Fischer could perhaps defeat summary judgment on this claim if she were able to show that, despite seemingly maintaining her compensation, position, and responsibilities on paper, her transfer did in fact set her on a dead-end path towards termination. This indeed is what Fischer argues, contending that working in government opportunities would prevent her from meeting her performance goals and thus lead to her discharge. There is insufficient evidence however, to support Fischer's contention. All Fischer points to is Avanade's struggle in government engagements in 2002, without any evidence concerning Avanade's status in this area in 2005. Furthermore, Fischer did not provide ample time to test her hypothesis regarding the dead-end nature of her new position, since she tendered her resignation on September 30, 2005, merely a few weeks after accepting the transfer. Because Fischer is unable to show that she was constructively discharged, there is no need for this Court to address the issue of retaliatory motive, and we affirm the grant of summary judgment for Defendant on this claim.

### III. Conclusion

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on Plaintiff's sex discrimination claim, and AFFIRM the grant of summary judgment for Plaintiff's claim of retaliation in the form of

constructive discharge. Accordingly, we REMAND to the district court for further proceedings consistent with this opinion.