In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2355

RICH STOCKWELL, et al.,

*Plaintiffs-Appellants*,

*v.*

CITY OF HARVEY,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-05868—**Robert W. Gettleman,** *Judge*.

ARGUED OCTOBER 28, 2009—DECIDED MARCH 12, 2010

Before RIPPLE, WILLIAMS and TINDER, *Circuit Judges*.

RIPPLE, *Circuit Judge.* The plaintiffs, Rich Stockwell, Gary Stockwell, Ron DeYoung and Steve Ciecierski brought this action against the City of Harvey, Illinois (the "City"). They allege that the City failed to promote them within its fire department (the "Department") on account of their race. The district court granted summary judgment for the City, and the plaintiffs appealed. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

Because this is an appeal from a grant of summary judgment, we take the facts in the light most favorable to the plaintiffs. *See Muro v. Target Corp.*, 580 F.3d 485, 487 (7th Cir. 2009).

In November 2005, Jason Bell was appointed as the City's fire chief by its mayor, Eric Kellogg. Prior to this appointment, Deputy Fire Chief Bruce Randall, who was white, had asked that he be allowed to return to his position as a captain. In light of Randall's departure, the City determined that Chief Bell would need assistance in administering the Department and, therefore, decided to hire not only a new Deputy Chief, but three Assistant Chiefs as well.

A sign-up sheet was posted so that firefighters could express their interest in the positions. The sign-up sheet informed applicants that "[a]ny member of the classified service with a minimum of ten years active service with the Harvey Fire Department may apply." R.29, Attach. 13. Each of the plaintiffs indicated his interest in the Assistant Chief position, and, with the exception of Mr. DeYoung, each also indicated that he was interested in the position of Deputy Chief. In total, nine individuals signed up to be interviewed for Assistant Chief, and eight for Deputy Chief. Of the applicants, three were African-American (Willie Buie, William Tyler and Phil Patterson); the remainder were white.

Before interviewing the applicants, Chief Bell offered the position of Deputy Chief to Captain Steve Gorman; Captain Gorman is white. Although Captain Gorman had not applied, Chief Bell believed that he "was the best guy for the job." R.37 at 150-51. Captain Gorman, however, conveyed to Chief Bell that he was not interested because he wanted to ride on the engine.

Prior to conducting any interviews, Chief Bell, along with Public Safety Fire Administrator ("PSFA") William C. Bell, Jr.,[1] created a written overview of the positions, which set forth both desirable and unacceptable qualities ("Overview Document"). This document made clear that the Department was looking for competence, loyalty, dedication and confidence. Unacceptable traits included selfishness, complaining, dishonesty and undermining authority.

On January 12, 2006, Chief Bell, PSFA Bell and Civil Service Commission Chair Herman Head interviewed the candidates. Each candidate was evaluated on a 1-5 scale in the categories of "Initial impression, decorum, and appearance"; "Interest, dedication and commitment"; "Character and Honesty"; "Personality and Teamwork Ethic"; "Overall poise and general ability to Communicate" and "Education and Certifications." *See, e.g.*, R.29, Attach. 22. Although all three interviewers stated that each interviewer filled out his own evaluation, only Chief Bell's evaluation forms appear in the record. More-

---

[1] PSFA Bell is Chief Bell's father. The PSFA was involved in running all of the City's departments.

over, the list of total scores provided by the City corresponds to Chief Bell's scores for the plaintiffs. In light of this record, and in light of the undisputed fact that Chief Bell made the final decision about whom to promote, we shall focus on Chief Bell's evaluations and on his bases for those evaluations.

After completing the interviews, Chief Bell made his promotion decisions. He stated that the interview scores were useful, but not determinative, in making those decisions: "After the interviews[,] [i]t wasn't an immediate promotion. It wasn't, 'okay, these are the numbers, take these guys with the highest number and they are promoted.' That was not the case." R.37 at 153. Chief Bell formulated a list of individuals based on "the totality of" the characteristics set forth on the Overview Document; he was looking for individuals he believed "really wanted the job and who [were] ready to give their all to their job." *Id.* at 155. Although his selections were approved by PSFA Bell and the comptroller, Chief Bell testified that "the decision of who I wanted is who I submitted and subsequently got." *Id.* at 157.

The four highest scores belonged to Buie, Tyler, Richard Climpson and Patterson. Buie, Tyler and Patterson ultimately received promotions. Chief Bell discussed the promotion with Climpson; however, Climpson determined that it was in his own best interest, as well as that of the City, not to pursue the promotion at that time. The next highest score belonged to Rich Stockwell. Chief Bell did not offer a position to Mr. Stockwell. According to Chief Bell, Mr. Stockwell had indicated to

Chief Bell that he would be retiring soon, and Chief Bell did not want to fill the positions with individuals who were using the promotion as a stepping stone to retirement. However, Chief Bell did offer a position to William Canavan, who had the next highest score, but he declined to accept it. Chief Bell then offered the final open position to Jeff Cook. Cook, who is white, neither applied for the position nor participated in the formal interview process. Nevertheless, Chief Bell spoke informally to Cook about the positions on several occasions. Chief Bell perceived Cook to be "very knowledgeable" and an employee who "put the department first," and, therefore, believed that Cook "would be a good asset to the management staff." *Id.* at 152.

## II

## DISTRICT COURT PROCEEDINGS

Mr. DeYoung, Mr. Ciecierski and the Stockwells brought this Title VII action in the district court, alleging that the City had failed to promote them on account of their race. The City moved for summary judgment, and that motion was granted.

The district court held that the plaintiffs had failed to establish a prima facie case of race discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The district court explained that for a white plaintiff to establish the first prong of the prima facie case—that he belongs to a protected class—he "must establish 'background []circumstances sufficient to demonstrate that the

particular employer has reason or inclination to discrimi-nate invidiously against whites or evidence that there is something fishy about the facts at hand.'" R.48 at 4-5 (quoting *Hague v. Thompson Distrib. Co.,* 436 F.3d 816, 822 (7th Cir. 2006)). The plaintiffs had argued that the City's "'minority only' hiring practices . . . that followed the election of Eric Kellogg in 2003" were sufficient to meet this prong; specifically, they noted that, since 2003, the City had hired only one white person to fill 32 positions in its police department. The court held, however, that "this [wa]s not necessarily compelling evidence to sup-port an inference that defendant discriminated against the majority because it regards the police department, not the fire department." *Id.* at 5.

The district court also determined that the plaintiffs had not established the fourth prong—that a similarly or lesser qualified non-white candidate was treated more favorably. The district court explained:

> With regard to the fourth element, defendant contends that when filling the deputy chief and assistant chief positions, Chief Bell asked four white men in the Harvey Fire Department to fill these positions, one of which accepted an assistant chief position. Promotion of one member of the disputed class does not necessarily defeat the prima facie case. The prima facie case is a flexible standard that is not intended to be applied rigidly. The exact content of the fourth prong may vary from case to case to take differing circumstances into account.

Although the promotion of one white firefighter may not automatically defeat the suggestion that the defendant treated non-whites more favorably, the instant case provides compelling evidence that this was not a case of reverse discrimination against the majority class. Here, prior to making its final decision on promotion, defendant had offered the position to four different white males. Plaintiffs have offered no evidence that could demonstrate that these were illegitimate offers, offers that defendant knew would not be accepted, or improper motivation. The uncontested facts, therefore, establish that defendant did not use discriminatory bias when filling the positions.

R.48 at 5-6 (internal citations omitted).

The plaintiffs now appeal.

## III

## DISCUSSION

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment" on account of race. 42 U.S.C. § 2000e-2(a)(1). An employer's refusal to promote an employee on account of race is a violation of Title VII. *See Grayson v. City of Chicago*, 317 F.3d 745, 747-48 (7th Cir. 2003). Here, the plaintiffs have attempted to establish their failure-to-promote claim using the *McDonnell Douglas* indirect method of proof.

The analysis of Title VII claims brought under *McDonnell Douglas* proceeds in three stages. First, the plaintiff must establish a prima facie case. Ordinarily, the four elements of the prima facie case in a failure-to-promote context are that the plaintiff (1) was a member of a protected class; (2) that he was qualified for the position; (3) that he was rejected for the position; and (4) that the position was given to a person outside the protected class who was similarly or less qualified than he. *Jackson v. City of Chicago*, 552 F.3d 619, 622 (7th Cir. 2009). In a reverse discrimination case such as this one, we have replaced the first element with a requirement that the plaintiff show "background circumstances" suggesting that the employer discriminates against the majority. *Farr v. St. Francis Hosp. & Health Ctrs.*, 570 F.3d 829, 833 (7th Cir. 2009).

After the plaintiff has made out a prima facie case, the burden shifts to the defendant to produce a legitimate, nondiscriminatory reason for the employment action. This is a light burden. *Pilditch v. Bd. of Educ. of City of Chicago*, 3 F.3d 1113, 1117 (7th Cir. 1993) (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-56 (1981)). Once the employer has articulated a legitimate, nondiscriminatory reason for its decision, the presumption of discrimination falls away. *Cianci v. Pettibone Corp.*, 152 F.3d 723, 726 (7th Cir. 1998). The plaintiff then has the burden of producing sufficient evidence to show that reason to be pretextual. *See McDonnell Douglas*, 411 U.S. at 802, 804.

The plaintiffs ask us to reconsider the "background circumstances" requirement. There is no necessity for us to

confront that issue today. Indeed, we need not address any of the plaintiffs' arguments with respect to whether they have established a prima facie case because, even if we assume that the plaintiffs have met this burden, we still must hold that they have failed to produce sufficient evidence of pretext.[2]

In order "to show pretext, a plaintiff must show that (1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403 (7th Cir. 2008) (internal quotation marks, citations and brackets omitted). *See also Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009). If the plaintiff uses indirect evidence to meet his burden, he must show that the employer's reason is not credible or factually baseless. *Fischer*, 519 F.3d at 403. The plaintiff also

---

[2] Although the district court did not address the pretext issue, finding instead that the plaintiffs failed to establish a prima facie case, it is well-settled that we may affirm on any ground supported by the record, so long as it has been adequately presented below. *E.E.O.C. v. Lee's Log Cabin, Inc.*, 546 F.3d 438, 442 (7th Cir. 2008). The presentment requirement exists because, if the issue is not raised below, the nonmovant has no obligation to present evidence on the point. *See Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006). In this case, the City contended in its motion for summary judgment that it had set forth legitimate nondiscriminatory reasons for its decision, and it asserted that the "plaintiffs have no evidence that proves that Harvey's legitimate reasons are pretextual." R.28 at 10.

must provide evidence that supports the inference that the real reason was discriminatory. *Id.* Although indirect proof of pretext is permissible, we must remember that, even if the business decision was unreasonable, pretext does not exist if the decisionmaker honestly believed the nondiscriminatory reason. *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir. 2004). This is because courts are not "superpersonnel department[s]" charged with determining best business practices. *Blise v. Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quotation marks and citations omitted). Subjective evaluations of each candidate are entirely consistent with Title VII. *Id.* at 868.

## A.

The plaintiffs submit that they have provided sufficient evidence of pretext because Chief Bell offered positions to individuals who never had signed up to be interviewed. We cannot accept this argument. Chief Bell testified that the plaintiffs had traits or were in situations that, according to the Overview Document, made them unacceptable. The fact that Chief Bell went outside the interview process in an attempt to find individuals who did not present these negative attributes and were a better fit for the position does not show pretext. Although the plaintiffs were not *completely* unqualified (for example, they had a long history of service to the Department), the fact the employer seeks out other individuals who are *better* qualified does not show pretext. Here,

according to Chief Bell, the plaintiffs presented specific, but significant, negative attributes that made them less-than-ideal candidates for specific positions at issue.

It is important to note that Chief Bell does *not* maintain that the nondiscriminatory basis for their rejection was simply the interview scores. Chief Bell specifically testified that he did *not* simply identify the highest scorers and offer them positions. Chief Bell also testified at length about his impressions of the plaintiffs.

**B.**

We now address the pretext arguments particular to each plaintiff.

**1.  Mr. DeYoung**

Chief Bell identified in his deposition the reason for rejecting Mr. DeYoung. He stated that he had worked "on shift" with Mr. DeYoung for many years and that Mr. DeYoung "would always be sort of negative." R.37 at 137. This observation caused Chief Bell to believe that Mr. DeYoung "possibly" might undermine management. *Id.* Chief Bell also stated that he believed that all the plaintiffs, except Rich Stockwell, would resist change. Both "[t]hose who constantly undermine authority" and "[t]hose who . . . resist change" appeared under "Qualities and Characteristics that are not Acceptable" in the Overview Document. R.29, Attach. 12 at 3. Far from contradicting Chief Bell, Mr. DeYoung admitted in his deposi-

tion that someone, whom he was unable to identify, had spoken to him about his perceived negative attitude.[3]

---

[3] Moreover, Mr. DeYoung admitted in his own deposition that he wore his duty uniform to the interview instead of his dress uniform. Although Chief Bell did not remark on this, his score sheet gives Mr. DeYoung a "2" in the category of "Initial impression, decorum and appearance." R.29, Attach. 17. This is enough to support an inference that Mr. DeYoung's choice of wardrobe played a role in Chief Bell's decision.

The City also relies on Mr. DeYoung's alleged abuse of sick time and lack of familiarity with the Mayor's vision for the City. However, we believe that, when all reasonable inferences are drawn in favor of the nonmovant, the trier of fact could find that Chief Bell learned of Mr. DeYoung's abuse of sick time after filling the positions.

The only evidence that Chief Bell relied on Mr. DeYoung's lack of knowledge of the Mayor's vision is a letter that Mr. DeYoung claims is inadmissible hearsay. The City claims that the letter is a business record. This is a problematic contention because, although PSFA Bell authenticates the letter, there is no evidence that lays the business record foundation. While it is quite possible that the foundation could be laid, it is not obvious. Although the City directs our attention to *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997), that case does not help its cause. In that case, we suggested that certain unattested hearsay documents, other than depositions and affidavits, *might* be admissible at the summary judgment stage in certain circumstances. *Id.* at 742. As an example, we noted "a letter inadmissible only because the signature on it had not been verified and there was no doubt that it could and would be." *Id.*

(continued...)

Mr. DeYoung claims that Chief Bell's testimony is "far less than an unambiguous statement that 'I did not select DeYoung because I believed that if selected to be assistant Chief, he would undermine management.'" Appellant's Br. 16. While such an explicit statement of a reason is generally helpful to employers, it is not a necessary ingredient in the assertion of a non-pretextual reason for a personnel decision. The defendant only has to produce admissible evidence that would permit a rational jury to conclude that the employment decision had not been motivated by discriminatory animus. *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (citing *Burdine*, 450 U.S. at 254-55). Here, the City put forth evidence that Chief Bell—the individual who made the hiring decision—had, at the relevant time, a personal belief that Mr. DeYoung might undermine

---

[3] (...continued)

To admit the letter here, however, might require a "broader dispensation to disregard the rules of evidence." *See id.* Despite the strength of this contention, the plaintiffs did not raise a hearsay objection in any of their eight motions to strike. They did, however, mention the hearsay issue in their memorandum in opposition to summary judgment. In any event, however, the City has provided an ample nondiscriminatory explanation without relying on the letter. If we did consider the letter and set aside all waiver issues, we would simply note that the letter alone would supply a non-pretextual, nondiscriminatory explanation. Mr. DeYoung admitted in his deposition that he did not articulate the Mayor's slogan. R.29, Attach. 4 at 5 ("I didn't understand the question . . . . I didn't know they were looking for a slogan.").

management and resist change. There is also evidence that these qualities were, at the time, considered unacceptable traits for members of the Chief's administrative team. This evidence is sufficient to allow a fact-finder to conclude that these nondiscriminatory factors drove the employment decision.

Mr. DeYoung, therefore, has not produced evidence of pretext. Although he stated in his deposition that he "never said no" to "special things, block parties, stuff like that," gave 110 percent, and saved a little boy's life, R.29, Attach. 4 at 5, he admitted that others thought him to be negative and that he did not wear his dress uniform to the interview. The perception of the decisionmaker is controlling. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 398 (7th Cir. 1998) (ADEA case).

### 2. Mr. Ciecierski

Chief Bell believed that Mr. Ciecierski possibly would not support him because Mr. Ciecierski had stated in his interview that he wanted to be Chief. Mr. Ciecierski was also among those who Chief Bell believed would resist change. As in the case of Mr. DeYoung, Chief Bell's personal knowledge of these considerations, at the relevant time, satisfies the City's burden.

Chief Bell also testified that he believed Mr. Ciecierski to be dishonest and untrustworthy. These are, according to the Overview Document, unacceptable qualities. In filling out score sheets, Chief Bell gave Mr. Ciecierski a "1" for "Character and Honesty." R.29, Attach. 16. Chief Bell

testified that, during Mr. Ciecierski's interview, he stated that Chief Bell never commanded a fire. Chief Bell considered that allegation "a blatant lie." R.37 at 146.

Mr. Ciecierski makes much of Chief Bell's comment that Chief Bell formed his opinion of Mr. Ciecierski's dishonesty "more so after" the selection process. *Id.* at 148. Chief Bell's testimony about the interview, however, combined with the score sheet, provides a sufficient basis for a fact-finder to conclude that concern about dishonesty was a factor in Chief Bell's decision.[4]

---

[4]  Mr. Ciecierski testified that Patterson "spent a lot of time over on the other side of the building, violating the chain of command." R.29, Attach. 8 at 7. He testified that Willie Buie had, at one point, stood and talked to PSFA Bell rather than fight a fire. He also stated, in reference to the unacceptable characteristics, that "[t]here is no one on that list that has not been accused of something on this list." *Id.* at 8. Although strong evidence of negative qualities might, in some cases, be sufficient to constitute indirect proof that the decisionmaker knew of the qualities, the self-serving statements of these plaintiffs are not sufficient. *See Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 726 (7th Cir. 2008) (holding that plaintiff's own reliance on relative qualifications is insufficient to show pretext); *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) ("[A]n employee's perception of his own performance . . . cannot tell a reasonable factfinder something about what the employer believed about the employee's abilities." (ellipsis in original; quotation marks and citation omitted)); *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) (holding that plaintiff's opinion that she was more qualified than either individual who was hired did not establish pretext). The

(continued...)

Mr. Ciecierski has not provided any basis for a jury to conclude that Chief Bell did not honestly hold his beliefs. Indeed, he testified that he had been critical of both PSFA Bell and Chief Bell. There was therefore sufficient evidence of a legitimate, nondiscriminatory reason for Mr. Ciecierski's nonselection.

### 3. Gary Stockwell

Chief Bell testified that Gary Stockwell had written or spray painted on a safety house[5] to show his dissatisfaction with the project. Chief Bell consequently believed that Mr. Stockwell possibly would not be supportive of the fire department. He also testified that Mr. Stockwell did "a lot of complaining." R.37 at 136. Once again, the decisionmaker's knowledge of negative qualities (or even the mere possibility of negative qualities) at the relevant time provides an adequate basis for the fact-finder to conclude that these potential negative qualities drove the employment decision.[6] Indeed, the fact that

---

[4] (...continued)

plaintiffs produce no disciplinary records, no testimony of superiors and no other corroborating testimony. None of the plaintiffs linked their knowledge of these negative attributes to Chief Bell.

[5] The safety house was a demonstration model used by the Department in educational problems.

[6] Mr. Stockwell and the other plaintiffs appear to argue that Chief Bell became aware of these negative qualities after filling

(continued...)

[6]  (...continued)
the positions. He relies on the following exchange from Chief
Bell's deposition:

> Q: So at the time you were involved in filling the vacant
> position of deputy chief and assistant chief, were you
> aware of any disloyalty on the part of any of the plain-
> tiffs?
>
> A: No, not on any part of the plaintiffs, no.
>
> Q: At the time you were involved in filling the vacant
> positions, were you aware of any disloyalty on the part
> of the plaintiffs—on any part of any of the plaintiffs to
> the fire department of the City of Harvey?
>
> A: No, not to the fire department, no.
>
> Q: At the time you were involved with filling the
> four—strike that. At the time you were involved in
> filling the vacant positions of deputy chief and assistant
> chief, were you aware of any problems that any of the
> plaintiffs had in working with you?
>
> A: Prior, no.

Reply Br. 7-8 (citing R.37 at 131-32). Even taking this testimony
in the light most favorable to the plaintiffs, it cannot bear the
weight that the plaintiffs place on it. The context is critical. Chief
Bell had just identified instances of disloyalty on the part of
Mr. DeYoung and the Stockwells (abusing sick time and
falsifying Gary Stockwell's residence). These statements can
be read to refer to those instances, but cannot be read to
sweep beyond that. Later in the deposition, Chief Bell was
specifically asked, "At the time you were involved in filling the
vacant firefighter position, did you believe that any of the
(continued...)

Chief Bell gave Mr. Stockwell a "1" on his score sheet for "Personality and Teamwork Ethic" provides additional support for this basis.[7]

---

[6] (...continued)
plaintiffs had not been supportive of the fire department?" R.37 at 135. He also was asked, "Did you ever believe that any of the plaintiffs would always complain or look to complain about things?" *Id.* at 136. That testimony expressed Chief Bell's concerns about Gary Stockwell on which we primarily rely.

[7] We do not rely on Mr. Stockwell's alleged falsification of his residence as a legitimate, nondiscriminatory reason for Chief Bell's failure to promote him because a reasonable fact-finder could conclude that Chief Bell did not become aware of this until after the selection process.

We also need not rely on Mr. Stockwell's rejection letter, which stated that he lacked the confidence to be an effective Chief. Our comments about Mr. DeYoung's rejection letter apply here, with one caveat: The plaintiffs did not specifically challenge Mr. Stockwell's letter at all. As in the case of Mr. DeYoung, we note that the City has provided an ample nondiscriminatory basis for its decision without the letter. The letter would suffice by itself to support summary judgment for the City. Gary Stockwell's own deposition testimony reveals that he remarked in his interview that he believed that at least three or four other candidates were more qualified than he. This is a slightly different formulation than used in the letter (which said "three or four candidates who you felt could do the job better," R.29, Attach. 19) but does not undermine the conclusion that Chief Bell believed that Mr. Stockwell lacked confidence.

Mr. Stockwell puts forth no evidence that Chief Bell did not believe these justifications. He admitted that he wrote "Elmo's house" on the safety house. R.29, Attach. 7 at 6. The only example he provided of his support for the fire department was from the 1980s and early 1990s. He had no run-ins with the administration.[8]

### 4. Rich Stockwell

Mr. Stockwell claims that there is a genuine issue of material fact with respect to the City's proffered reason for failing to promote him. Chief Bell testified that, even before posting the sign-up sheet, Mr. Stockwell told him that he soon would be leaving the Department and that, consequently, the Chief concluded that Rich Stockwell would not be dedicated and committed to the Department over the "long haul." *See* R.29, Attach. 12 at 3. Later in his deposition, Chief Bell discussed another conversation with Mr. Stockwell, which occurred after interviews, but before the promotion decisions were made. Chief Bell testified that, when he told Mr. Stockwell that he "was high on everybody's list," Mr. Stockwell implied that he was retiring. R.37 at 159.

Mr. Stockwell maintains, however, that Chief Bell's statements cannot be squared with statements that

---

[8] Mr. Stockwell filed grievances on behalf of the union, but because Chief Bell never said anything about that activity, we have no reason to believe that he held it against Mr. Stockwell.

Mr. Stockwell made in his own deposition. Mr. Stockwell testified that he never suggested "before December, 2005" or "before [he] applied" that he planned to retire. R.37 at 224-25. He did testify about a conversation with Chief Bell that occurred *after* decisions were made. Mr. Stockwell asked how he did, and Chief Bell's response was, "you did well." *Id.* at 256-57. Mr. Stockwell testified that he retired "mostly because of not being able to obtain this position." *Id.* at 225. Mr. Stockwell believes that this conflicting testimony raises a genuine issue of material fact with respect to whether he had communicated his intention to retire prior to the interviews and, therefore, whether Chief Bell could have gotten the impression that he was not dedicated to the Department for the "long haul." *See* R.29, Attach. 12 at 3.

On close examination, however, we do not perceive there to be a true conflict between the testimony of Chief Bell and that of Rich Stockwell that creates a genuine issue of material fact concerning Chief Bell's motivation in passing over Mr. Stockwell. In his deposition, Chief Bell testified as follows:

> Q. At the time you were involved in filling the vacant—strike that. At the time you were involved in filling the deputy chief and assistant chief positions, did you believe that any of the plaintiffs were just trying to pension off at a higher rank in salary?
>
> A. I didn't believe that, but the one instance, yes, I was led to believe that.

Q. And which person did that involve?

A. Rich Stockwell. I talked to him one time distinctly I remember. And he was just saying that he couldn't really do this anymore and he was—he was going to be getting out pretty soon.

Q. Was that in connection with the deputy chief or assistant chief position?

A. No, this was prior. This was prior to—I think prior to even the sign-up sheet. It was just conversations we had, because I worked on his shift. This was, I don't know exactly, but he was leaving. He just didn't know when, but it was real soon. That's the impression he gave me.

R.37 at 133-34. In short, while working on the same shift as Chief Bell, Mr. Stockwell expressed his belief that he did not know how much longer he could continue actively fighting fires. Chief Bell concluded from these statements that Mr. Stockwell was planning to retire sometime in the near future.

In his deposition, Mr. Stockwell does not deny having made general comments to men on his shift concerning his inability to continue in his present position. Instead, Mr. Stockwell's testimony is more focused on the subject of retirement. The following question and answer series is taken from Mr. Stockwell's deposition:

Q. Did you have any conversation with anyone in the Fire Department before December, 2005 about any plans to retire?

A. No.

Q. So you never suggested to anyone before you applied for Deputy Chief or Assistant Chief that you might be retiring in a year or two?

A. No. No. I never suggested—I never planned a date of retirement. When it came up, it came up. I finally decided that because of—and mostly because of not being able to obtain this position, one of those positions, is that I felt that I was jeopardizing the guys I was working with staying in the position I was in.

Q. How were you jeopardizing?

A. I am getting older and it is hard to fight fires. Everybody works as a team. You have to depend on one another. I didn't want guys to have to worry about me and having to pick up the slack because of me. But I still had usefulness inside me that I could serve the department and wanted to get a position where I could still be there.

*Id.* at 224-25. Mr. Stockwell states clearly that he never told anyone that he would be retiring in "a year or two" and that he had "never planned a date of retirement." These statements are much narrower than Chief Bell's recollections of Mr. Stockwell's statements that the physical strain of the job was getting to him—a sentiment echoed in Mr. Stockwell's own deposition testimony. Based on these statements, Chief Bell was left with the *impression* that Mr. Stockwell would be retiring in the near future. Although Chief Bell may have been mistaken in the conclusions drawn from Mr. Stockwell's statements, "[a] reason honestly described but poorly

founded is not a pretext, as that term is used in the law of discrimination." *Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir. 1987). Nothing in Mr. Stockwell's statements explicitly contradicts Chief Bell's testimony concerning his conclusion about Mr. Stockwell's possible retirement. Therefore, those statements do not create a genuine issue of fact for the jury.[9]

---

[9] Nor can Mr. Stockwell establish pretext by showing that he was more qualified than those eventually promoted to the Deputy and Assistant Chief positions. Mere comparison of relative qualifications cannot establish an illicit motive unless "no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Millbrook*, 280 F.3d at 1180-81 (quotation marks and citation omitted). Mr. Stockwell cannot meet this standard. Chief Bell testified that Buie had been serving as a de facto deputy chief without the title. Tyler, though a rank below Mr. Stockwell, was a "top tier" fireman who had served two stints with the Department covering a total of about 12 years. R.37 at 12, 165. Patterson had been with the Gary Fire Department for 20 years, and had been a captain there. We recite these facts not to reassess Chief Bell's decisions, but simply to establish that, based on the information before us, a reasonable person could have chosen Buie, Tyler and Patterson over Mr. Stockwell.

Rich Stockwell testified that Tyler had been asked to resign because he had alcohol in the ambulance and that Patterson had "probably got a discipline record as long as my arm," *id.* at 242, was chronically late, and would abandon his post. Buie was "not a leader." *Id.* at 241. However, Mr. Stockwell did not

(continued...)

## Conclusion

The City of Harvey, through its Fire Chief, has set forth legitimate, nondiscriminatory reasons for declining to promote the plaintiffs to Deputy and/or Assistant Chief. The plaintiffs have failed to produce sufficient evidence to create a genuine issue of fact regarding whether the reasons were pretextual. The district court's grant of summary judgment is therefore affirmed.

AFFIRMED

---

[9] (...continued)
recall any conversations about Patterson, Tyler or Buie with PSFA Bell or Chief Bell. He therefore has failed to show that Chief Bell knew about these issues.

---

3-12-10