In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 12-1668 & 12-1681

MICHAEL J. GAROFALO and
MARK S. PEERS,

*Plaintiffs-Appellants,*

*v.*

VILLAGE OF HAZEL CREST, *et al.*,

*Defendants-Appellees.*

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 06 C 3674 & 06 C 3735 — **William T. Hart**, *Judge.*

ARGUED NOVEMBER 4, 2013 — DECIDED JUNE 12, 2014

Before EASTERBROOK, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Plaintiff-Appellants Michael Garofalo and Mark Peers appeal from the district court's grant of summary judgment in favor of Defendant-Appellees, the Village of Hazel Crest and its individual officers, in their race discrimination case. Garofalo and Peers, both white, were sergeants on the Hazel Crest police force. They were among four front-runners considered for a depu-

ty police chief position, which ultimately went to a black officer who was not one of the four initially-discussed candidates. Plaintiff-Appellants assert that the Village and its officers discriminated against them by promoting a black officer they contend is unqualified for the position. They sued the Village under, *inter alia*, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. §§ 1981, 1983, as well as under Illinois state law.

We affirm the district court's finding that Plaintiff-Appellants failed to present sufficient evidence to withstand Defendant-Appellees' motion for summary judgment. Summary judgment was proper on Garofalo's and Peers's claims of racial discrimination because they did not present sufficient evidence to permit a reasonable jury to find that they were the object of unlawful discrimination.

## I.  STANDARD OF REVIEW

We conduct de novo review of the district court's decision involving the cross-motions for summary judgment. *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013). "As with any summary judgment motion, we review cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the non-moving party." *Id*. (citation and internal quotation marks omitted). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Accordingly, we review the record in the light most favorable to Garofalo and Peers. Our summary of facts thus reflects the facts set forth in a light most favorable to them. "We do not vouch for their truth in any

other sense." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 673 (7th Cir. 2012).

On the procedural issue of whether the district court correctly found that Defendant-Appellees timely raised their mixed-motives affirmative defense, we review for abuse of discretion. *Williams v. Lampe*, 399 F.3d 867, 871 (7th Cir. 2005).

## II. FACTUAL BACKGROUND

### A. Demographics of the Village of Hazel Crest

It is undisputed that Hazel Crest was, at the time of the disputed promotion, predominantly black. As measured by the 2000 Census, the Village of Hazel Crest was over 75% black and approximately 20% white, and as measured by the 2010 Census, it was 85.2% black and 10.2% white. Despite these demographics, Hazel Crest had no black police officers in the supervisory ranks well into 2005, when the village elected Robert Donaldson, the Village's second black mayor. Donaldson had campaigned on the promise to increase racial diversity in the Hazel Crest work force, including the police department.

### B. Structure of Hazel Crest Police Department

Hazel Crest's police hierarchy is very compact: at the time of the events in question, the department comprised one chief, two deputy chiefs, five sergeants, and patrol officers. The two deputy chiefs each had different responsibilities. One deputy chief was Commander of the Patrol Division (also known as Deputy Chief–Detectives) and the other was Commander of the Support Services Division (Deputy Chief–Support Services). The chief was appointed by the village manager (at least nominally—more on the role of the

mayor later), and the deputy chiefs were selected by the chief.

Chief Peter Fee and one of his deputy chiefs, Richard Lenz, resigned after the election of Donaldson to the mayorship. After these resignations, deputy chief Gary Jones was named acting police chief on April 22, 2005. Robert Palmer, the village manager, asked Jones not to make any appointments to the deputy chief position until the 'acting' designation was removed from his title and he received a full appointment.

### C.  Hazel Crest's Deputy Chief Promotion Policy

The Illinois Municipal Code, 65 ILCS 5/10-2.1-4, and a Hazel Crest village ordinance provide that the two deputy chiefs must be current members of the Hazel Crest police force, who have each served at least five years in the village. The chief is allowed a large amount of discretion in choosing from the candidates who meet these criteria; there is no application or test to qualify for the promotion.

Peter Fee, Gary Jones's predecessor as chief, adopted a description for the deputy chief position in 2001, which was not part of the ordinance. The description was as follows:

**DESIRED MINIMUM QUALIFICATIONS**

Education and Experience

(A) High school diploma or equivalent; and

(B) Completion of the State Basic Training Academy or equivalent academy; and

(C) Minimum of five (5) years work as a police officer for the Hazel Crest Police Department; and

(D) Minimum of two (2) years work experience as a police sergeant or higher; and

(E) Although not required, desirable to possess at least a bachelor's degree in law enforcement or related curriculum from an accredited college or university.

…

**SPECIAL REQUIREMENTS**

(A) Must possess a valid State of Illinois Driver's License.

(B) Basic Law Enforcement Training (or Police Officer Standards and Training) certification or equivalent.

(C) No felony convictions.

(D) Successful completion of police supervision course of instruction from an accredited Illinois police academy. In addition, it is desirable that the individual have completed a mid-level police management course, such as the F.B.I. National Academy or the Northwestern University School of Staff and Command.

(E) Working knowledge of modern police and business information management systems.

The description also provided that,

The Deputy Police Chief is an exempt rank appointed by the Chief of Police … . The job description does not constitute an employment agreement between the employer and employee and is subject to change by the employer

as the needs of the employer and requirements of the job change.

### D. Gary Jones's Conversations with Colleagues while Acting Chief, then Chief

Upon his initial promotion to acting chief, Jones spoke to a number of his colleagues about the officers he would like to promote should he receive a full appointment as chief. He had conversations with many people about filling the deputy chief vacancies, including his predecessor, Fee, as well as the officers he was considering for the spots. From the first, Jones was set on appointing Sergeant Gary Gentzle, his long-time friend and partner, to the position of Deputy Chief–Detectives. Patrick Murray, Michael Garofalo, Mark Peers, and David Nelson were all sergeants, and all were considered for the other promotion—the position of Deputy Chief–Support Services.

Not all stood an equal chance of getting the promotion. Indeed, in many of the conversations, including conversations with Peers and Garofalo, Jones spoke of his plans to give Murray the promotion. In a conversation with Murray himself, Jones stated that he was planning to name Murray the Deputy Chief–Support Services. But in at least one conversation with the previous chief, Fee, Jones discussed why Murray would not be suitable for the job, including the fact that Fee found Murray untrustworthy, Murray's past disciplinary history, as well as allegations against Murray that he had inappropriately propositioned a subordinate officer's wife. It does not appear that Malcolm White was discussed during any of these initial conversations as a candidate for promotion. Nor does it appear that Garofalo or Peers was ever discussed as a frontrunner or a lock for the promotion.

It was nominally the Village Manager, Robert Palmer, who appointed Jones the interim chief after Fee's resignation, then gave him the full appointment, but Mayor Robert Donaldson played an outsize role in charting the course of Jones's promotions. While Jones was serving as acting chief, Palmer made clear to Jones that the mayor expected an increase in racial diversity in the Hazel Crest workforce, including the police department. Palmer explained to Jones that the mayor expected the police force's makeup to more closely reflect the racial makeup of the community. It is unclear if Malcolm White's name was specifically mentioned by Palmer or Donaldson, but Donaldson did thank a "Malcom White" for support in his acceptance speech. Donaldson's campaign materials also included a photograph showing Donaldson and White, with a caption identifying both by name.

Once these expectations were articulated to Jones, he openly lamented about the expected appointment of White. Jones told Gentzle that "the Mayor would like someone black to be the second deputy chief." In a conversation with Richard Lenz, his former colleague, Jones stated that Donaldson had told Jones he had to promote White to deputy chief. And Jones told Murray that despite their earlier conversation, Jones had to name a black deputy chief in order to remain chief because Donaldson was demanding black representation at all levels of the department. Jones then asked Murray if he would accept the position of Administrative Sergeant, a newly-created position.

On July 12, 2005, Jones appointed White deputy chief.

### E.  Jones's Conduct

From time to time, Jones made comments to his fellow officers about the future of the department, apparently in reference to the increasing importance of racial diversity following Donaldson's election. For instance, before he was appointed chief, Jones recommended to his fellow officers that they seek employment elsewhere, and stated that they would have no opportunities at Hazel Crest because they were "the wrong color" for promotions. In the process, Jones used racial slurs in reference to Mayor Donaldson. Plaintiff-Appellants also allege that management created a "hostile environment that fostered racial tension," but do not present specific facts to support this statement. Once Jones capitulated to Donaldson's plans for racial diversity by promoting White, Garofalo and Jones felt their career advancement opportunities were foreclosed.

There were also isolated incidents in which Jones used profanity while speaking with Garofalo, and in which White used profanity to describe Garofalo to a fellow officer. When an anonymous note was left in a suggestion box, apparently one containing racially provocative content, a black officer was upset and stated that he would "kill" the author of the note.

### F.  The Relative Qualifications of the Candidates

Because Plaintiff-Appellants' theory turns on the question of relative qualifications—whether either officer stood a chance of promotion, of which he was deprived by White's promotion—we briefly examine the qualifications of the four sergeants who were widely considered frontrunners, as well as White's qualifications.

### 1. Michael Garofalo

Garofalo met all of the desired minimum qualifications and special requirements for the deputy chief position listed in Fee's position description. He possessed an associate's degree, bachelor's degree, and master's degree in criminal justice, and graduated from the Northwestern University School of Police Staff and Command.

He was promoted to sergeant in October 2001, and had ranked first in the sergeant selection process that year, which included a written exam, oral interview, and an assessment test of practical skills. And he served as a team leader and team coordinator for the South Suburban Emergency Response Team, which he described as "similar to a SWAT team." However, Jones stated that he believed Garofalo suffered from a lack of leadership, as well as deficiencies in his decision-making abilities, and former chief Fee also advised Jones that Garofalo "was very hesitant to make a meaningful decision." Moreover, Jones stated that he had concerns with Garofalo's reliability, as he had resigned from at least two appointments without serving out a full term.

### 2. Patrick Murray

Patrick Murray had been a sergeant since 1995. He held bachelor's and master's degrees in law enforcement, and had completed a police supervision course at the Northwestern University School of Staff and Command. He met all of the minimum and desired qualifications for the deputy chief position listed in Fee's position description. Additionally, Jones believed Murray to be the only candidate who could make sure the department kept its accreditation by the Commission on Accreditation of Law Enforcement Agencies.

However, Jones had been involved in an internal investigation of Murray based on allegations by Nelson that Murray had made advances towards Nelson's wife while Murray was Nelson's superior officer, and that Murray had also improperly interfered in a traffic accident in which Nelson was involved. The internal investigation resulted in a three-day suspension of Murray. Jones stated that he "did not feel that he could place his trust and confidence in Murray" as a result of the investigation, and that he did not believe that the rank-and-file officers would respect Murray as a deputy chief. Jones's predecessors, former chiefs Fee and Harold Moore, apparently agreed with this assessment. Jones had been told by Fee that Fee would never put Murray in a position of trust in the department, and Jones received similar counsel from Moore.

### 3. David Nelson

David Nelson held a bachelor's degree in criminal justice, and had been promoted to the position of Sergeant in 2003. Nelson did not have two years of work experience as a sergeant (he barely missed the cutoff, as he had 23 months of such experience), nor had he completed a mid-level police management course, though he claims he was scheduled to matriculate at the Northwestern University School of Police Staff and Command.

Jones was advised by former chief Fee and Murray that Nelson was not qualified for the position of deputy chief, as he failed to meet the minimum qualification of two years as a supervisor. Additionally, Jones stated that he felt Nelson was "lackadaisical" in his attitude, and lacked the command presence he was looking for in a deputy chief.

### 4. Mark Peers

Peers did not possess a college degree, but met all the other desired minimum qualifications and special requirements for the position of deputy chief stated in Fee's position description. He received an Award of Valor from the Village, after demonstrating outstanding bravery and personal courage in the apprehension of an armed and dangerous felon.

Peers had asked to be considered for the Deputy Chief of Patrol position. Jones stated that Peers, told that Gary Gentzle would be picked for the Deputy Chief–Patrol position, stated that he would rather stay a patrol sergeant since he would have the most seniority of any officer on the street and could pick his own schedule. Moreover, Jones commented that Peers was called "Hank" by the other officers, a nickname referring to a character played by Jim Carrey in the movie *Me, Myself, and Irene*. Jones asserted that this was meant to highlight Peers's "volatile and unstable personality," and that he did not believe Peers had the respect of the men he supervised.

### 5. Malcolm White

White had been a patrol officer in Hazel Crest for approximately eight years, and before that had been a tactical officer with the City of Harvey. He held an associate's degree from a community college. He had not been promoted to sergeant—he ranked sixth out of nine candidates on the sergeants' promotional exam administered a year before his promotion—but had previously served as a shift commander in the absence of a sergeant. White served as an elected union representative for Hazel Crest officers, and represent-

ed the union in union contract negotiations against Jones, who was a management representative.

### G. District Court Litigation

After they were not promoted, Garofalo, Murray, Nelson, and Peers brought suit against the Village of Hazel Crest and Donaldson, Jones, and Palmer. They alleged that the Defendant-Appellees had engaged in discriminatory and unlawful practices under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2; violated 42 U.S.C. § 1983 by intentionally interfering with plaintiffs' civil rights under color of law; violated 42 U.S.C. § 1981 by intentionally interfering with Plaintiff-Appellants' employment relationship based on race; conspired to deprive the officers of their civil rights in violation of 42 U.S.C. § 1985; and, under Illinois law, breached the contract between the Plaintiff-Appellants and the Defendant-Appellees created by the Hazel Crest employee personnel manual.

After discovery, Defendant-Appellees and Plaintiff-Appellants filed cross-motions for summary judgment, and Nelson voluntarily withdrew from the case. The district court granted Defendant-Appellees' motion for summary judgment on all of the claims relating to Garofalo and Peers, and denied Garofalo's and Peers's summary judgment motions. The district court granted Defendant-Appellees' motion for summary judgment on the state law claim, noting that Plaintiff-Appellants had failed to respond to Hazel Crest's contention that the claim should be dismissed as the employee personnel manual is not an enforceable contract. As to the racial discrimination claims, the court granted summary judgment against Garofalo and Peers on the grounds that the officers had failed to present evidence that

they had "any significant chance of being the one actually selected as Deputy Chief," as the evidence showed Murray had been bound to get the promotion. The court asserted that without evidence of this nature, Garofalo and Peers could not succeed on a lost chance theory, even if the court accepted as true the fact that race was considered in the promotion process and Defendant-Appellees failed to show that the policy was narrowly tailored to advance a compelling interest. The court also granted summary judgment in favor of Defendant-Appellees on all claims relating to constructive discharge.

However, the district court denied Defendant-Appellees' motion for summary judgment as it related to Murray, as well as Murray's cross-motion, finding that disputed factual issues required a trial on Murray's failure to promote claim. The court found the evidence on the record to be adequate to raise a genuine factual dispute as to pretext, but that it was not conclusively resolved whether "Jones's stated legitimate reasons [for not hiring Murray] are pretext." The court stated that "it cannot be assumed that Jones stated that he would have selected Murray if he had not been pressured to instead select an African American."

Murray and the Defendant-Appellees settled before trial, and entered a consent decree stipulating that Murray was the most objectively qualified candidate for the Deputy Chief of Support Services position. Garofalo and Peers timely appealed. On appeal, they renew their argument that they should survive summary judgment on a lost chance theory, and also assert that the work environment in the Hazel Crest police force under Jones constituted constructive discharge. Plaintiff-Appellants also argue that Defendant-Appellees

were not entitled to use the mixed motives affirmative defense because they did not plead the affirmative defense explicitly.

## III. DISCUSSION

First, we quickly dispose of three peripheral arguments in the case: (1) Plaintiff-Appellants' argument that Defendant-Appellees' mixed-motives affirmative defense was untimely, (2) Plaintiff-Appellants' argument that the work environment at Hazel Crest constituted constructive discharge, and (3) Defendant-Appellees' argument that the consent decree precludes this appeal. All three are invalid arguments. We then move to the major issues at play: whether the evidence establishes a *prima facie* case of race discrimination, and if so, whether Plaintiff-Appellants can survive summary judgment. Because we conclude that Garofalo and Peers present no evidence suggesting that they had a chance at the promotion in the absence of the impermissible consideration of race, we affirm the district court's grant of summary judgment.

### A. Mixed-Motives Affirmative Defense

We are not moved by Garofalo's and Peers's contention that the district court improperly granted summary judgment on an affirmative defense that was waived. Plaintiff-Appellants argue that Defendant-Appellees did not raise their affirmative defense of mixed motives—the argument that neither of the officers would have been promoted even in the absence of race-based discrimination—until the summary judgment stage. We review this contention for an abuse of discretion, and will only find that the district court abused its discretion if the defendants' delay caused the

plaintiffs to suffer prejudice. *Williams*, 399 F.3d at 871. We do not find any such prejudice here, and decline to find that the district court abused its discretion.

Plaintiff-Appellants are correct that the Federal Rules of Civil Procedure require that "a party must affirmatively state any avoidance or affirmative defense … ." Fed. R. Civ. P. 8(c). Our circuit considers mixed motives an affirmative defense. *Speedy v. Rexnord Corp.*, 243 F.3d 397, 401 (7th Cir. 2001) (stating that the Supreme Court case of *PriceWaterhouse v. Hopkins*, 490 U.S. 228, 258 (1989), "established the 'mixed-motive' affirmative defense"). However, "the rule that forfeits an affirmative defense not pleaded in the answer (or by an earlier motion) is, we want to make clear, not to be applied rigidly." *Matthews v. Wis. Energy Corp., Inc.*, 642 F.3d 565, 570 (7th Cir. 2011) (citation and internal quotation marks omitted). We will generally find that "[t]he failure to plead an affirmative defense in the answer works a forfeiture only if the plaintiff is harmed by the defendant's delay in asserting it." *Id.* (citation and internal quotation marks omitted). Defendant-Appellees correctly argue that the argument was obvious throughout the case, and that they raised it in detail in their initial summary judgment brief, as well as in their initial motion to disqualify one counsel from representing all plaintiffs. Garofalo and Peers had the opportunity to challenge this argument in their own summary judgment submissions, as well as in their opposition briefs to the Defendant-Appellees' summary judgment brief. Additionally, the district court addressed this defense from the outset of the case, when it stated that "[t]o the extent that one plaintiff proves that he was the one who would have been promoted if not for discrimination, he provides a defense against the claims of the other three [plaintiffs]."

Defendant-Appellees did not waive the affirmative defense of mixed motives, and the district court did not abuse its discretion in allowing this argument to be raised in the summary judgment briefing.

### B. Constructive Discharge

Likewise, we agree with the district court that summary judgment was proper on Plaintiff-Appellants' constructive discharge claim. "[T]o establish 'constructive discharge,' the plaintiff must … show that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Penn. State Police v. Suders*, 542 U.S. 129, 134 (2004); *see also id.* at 146–47 (stating that constructive discharge "entails something more" than a mere hostile work environment claim: the plaintiff "must show working conditions so intolerable that a reasonable person would have felt compelled to resign"). Constructive discharge "is deemed to have occurred when the plaintiff shows that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (citation and internal quotation marks omitted). For instance, "[a] person who is told repeatedly that he is not wanted, has no future, and can't count on ever getting another raise would not be acting unreasonably if he decided that to remain with this employer would necessarily be inconsistent with even a minimal sense of self-respect, and therefore intolerable." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 655 (7th Cir. 2000). If we accept Plaintiff-Appellants' logic—that their failure to be promoted to deputy chief constituted constructive discharge—almost every member of a municipal or governmental hierarchy would end up being constructively dis-

charged because hierarchies generally narrow at the top. This cannot be the case.

Even accepting that Garofalo and Peers intend to make a more specific case for how the working environment at Hazel Crest worsened as to become intolerable, they fail to provide us with sufficient evidence for us to adduce that conclusion. Most of the statements of which Garofalo and Peers complain were made by Jones prior to his promotion, and none were made to suggest Garofalo and Peers could not continue as sergeants. *Cf. Fischer*, 519 F.3d at 409 (noting that constructive discharge occurs when "based on an employer's actions, the handwriting was on the wall and the axe was about to fall") (citation and internal quotation marks omitted). Moreover, there is no evidence that these were repeated statements by a person in position of authority—indeed, Jones's comments read like the frustrated statements of a colleague commiserating with his fellows. Summary judgment was proper on Garofalo's and Peers's claim of constructive discharge.

### C. Preclusive Effect of the Consent Decree

We are not convinced by Defendant-Appellees' assertion that the consent decree entered into between the Village and Murray has preclusive effect over the present matter. The consent decree, by its terms, did not "admit[] any fault or conced[e] the veracity of any allegations," and merely stipulated in a conclusory statement that "[Murray and the village] agree that Patrick Murray will be retroactively promoted." Moreover, the consent decree was entered into between Murray and the Village, and did not involve either Garofalo or Peers. It is a longstanding principle that "parties who choose to resolve litigation through settlement may not dis-

pose of the claims of a third party … . A court's approval of a consent decree between some of the parties therefore cannot dispose of the valid claims of nonconsenting intervenors." *Firefighters Local 93 v. City of Cleveland,* 478 U.S. 501, 518 (1986). The consent decree cannot bar Garofalo and Peers from pursuing their valid claims, as they were not parties to the decree.

### D. Racial Discrimination Claim

That brings us to the substantive heart of the case. In challenging the grant of summary judgment, Garofalo and Peers argue that they produced sufficient evidence of discrimination, primarily under the direct method. Reviewing the record de novo, we disagree. While "[n]o real evidence has been submitted which would *preclude* a jury finding of discrimination" on the part of the Village as to Garofalo and Peers, the two Plaintiff-Appellants "offer[] no evidence that would allow a trier of fact to find" that unlawful discrimination caused the two officers not to be promoted. *See Bass v. Joliet Pub. Sch. Dist. No. 86,* 746 F.3d 835, 841 (7th Cir. 2014).

"[W]hen all is said and done, the fundamental question at the summary judgment stage is simply whether a reasonable jury could find prohibited discrimination." *Id.* at 840 (citing *Perez v. Thorntons, Inc.,* 731 F.3d 699, 703 (7th Cir. 2013); *Coleman v. Donahoe,* 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). While it can be debated whether it is still useful to sharply distinguish between the direct and indirect methods of proof, under the direct method, "[a] plaintiff can survive summary judgment by producing either" circumstantial or direct evidence, "as long as it creates a triable issue on whether discrimination motivated the em-

ployment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011).

Under the direct method, the case at hand is trickier than *Bass*, where the plaintiff "presented no—literally no—evidence that her firing was for a prohibited reason." *Id.* Here, there is evidence that White's promotion was based on the prohibited consideration of his race. Evidence, too, that Murray's sudden change of fortunes was due to Murray's race—Jones admitted as much. But we are skeptical that the evidence that White was promoted based on his race, or the fact that Murray did not receive the promotion based on his, could be used by a reasonable jury in service of the conclusion that *Garofalo and Peers* were not promoted because of their race. There is no specific evidence, as it relates to Garofalo or Peers, "that would allow a trier of fact to find that [race] discrimination lay behind" the Village's decision not to promote the Plaintiff-Appellants. *Id.* As pertains to the two Plaintiff-Appellants, "the record contains neither explicit declarations of a discriminatory motive nor sufficient circumstantial evidence for a rational jury to infer discrimination." *See Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1157 (7th Cir. 2014). Plaintiff-Appellants argue that they have presented evidence of Murray's shortcomings, and that they have established that his chance at the promotion, absent Jones's impermissible considerations of race, was not a sure thing. But that is negative evidence that may lead a juror to conclude that Murray would not have gotten the promotion. Even construing that evidence in the light most favorable to Garofalo and Peers, there is no affirmative evidence on which a reasonable juror could—absent speculation or conjecture—decide that Garofalo or Peers would have received

the promotion absent the impermissible consideration of race.

The Plaintiff-Appellants fare slightly better under the indirect method, because they can get as far as establishing a *prima facie* case. For a failure-to-promote claim, the indirect method of proof required the Plaintiff-Appellants to offer evidence that: (1) they were members of a protected class; (2) they were qualified for the position sought; (3) they were rejected for the position; and (4) the employer promoted someone outside the protected group who was not better qualified than the Plaintiff-Appellants. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728–29 (7th Cir. 2013). They met the first prong of the test. *See, e.g.*, *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 280–81 (1976) (holding that Title VII prohibits discriminatory preference for any racial group, including the preference of black employees over white employees); *Everett v. Cook Co.*, 655 F.3d 723, 730 (7th Cir. 2011) (explaining that in a case alleging discrimination against white plaintiffs, the first prong of the indirect method test requires that "the plaintiff show 'background circumstances' suggesting that the employer discriminates against the majority") (internal quotation marks and citation omitted). And they met the second, as they introduced evidence that, if believed by the trier of fact, would show that they were meeting the requirements of their jobs, and that they met all or most of the preferred and required qualifications for the Deputy Chief position, and that they were well-regarded enough that they were being discussed for the promotion. The third prong, too, is uncontested. As for the fourth prong, construing the evidence in the light most favorable to Garofalo and Peers

would permit the conclusion that White was not better qualified than the two Plaintiff-Appellants.

However, the Defendant-Appellees were entitled to summary judgment because they "articulated non-discriminatory reasons for the decisions not to promote" Garofalo and Peers, reasons that Garofalo and Peers could not prove were pretext. *See Johnson*, 733 F.3d at 729. Defendant-Appellees offered evidence that Garofalo was not selected for the promotion because Jones and others believed Garofalo suffered from a lack of leadership and deficiencies in his decision-making abilities. As for Peers, Defendant-Appellees offered evidence that Peers was known by the other officers to have a "volatile and unstable personality," and that Jones and others believed that Peers did not have the respect of the men he supervised. Jones also believed that Peers did not want the particular promotion in question. Garofalo and Peers have not "presented evidence to counter that explanation and permit a finding of pretext." *Id.* Pretext is shown by the plaintiff asserting evidence demonstrating that "(1) the employer's non-discriminatory reason was dishonest and (2) the employer's true reason was based on a discriminatory intent." *Stockwell v. City of Harvey*, 597 F.3d 895, 901 (7th Cir. 2010). In this case, the Plaintiff-Appellants must "raise an issue of fact regarding each of the reasons proffered" for Jones's decision not to promote them. *Wolf v. Buss (Am.), Inc.*, 77 F.3d 914, 920 (7th Cir. 1996). They failed to do so. Accordingly, summary judgment was properly granted.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgment.